Angela BAUMIA, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000279–MR.

Supreme Court of Kentucky.

May 23, 2013.

Molly Mattingly, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, James Daryl Havey, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Jefferson Circuit Court jury found Appellant, Angela Baumia, guilty of murder, first-degree wanton endangerment, first-degree criminal mischief, and driving under the influence. For these crimes, Appellant received a thirty-five year prison sentence. She now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that the trial court erroneously: (1) allowed the introduction of Appellant's pre-arrest silence during the Commonwealth's case-in-chief, (2) permitted the introduction of the accident scene video, (3) admitted the 911 recording, (4) failed to exclude Appellant's post-collision use of profanity, and (5) permitted the introduction of Appellant's misdemeanor theft by deception conviction during the sentencing phase of her trial.

For the reasons set out below, we affirm Appellant's conviction and thirty-five year prison sentence.

## I. BACKGROUND

On June 26, 2010, Appellant and her boyfriend, Cedric Thompson, attended a birthday party that was held at Appellant's father's house in the Fincastle neighborhood of Louisville, Kentucky. According to Appellant, she began consuming alcohol between 5:00 and 5:30 p.m. on the date in question.

Around 8:00 p.m., Appellant decided to leave the party and entered the driver's side of her vehicle with an open beer bottle. Thompson entered the vehicle on the passenger's side. According to Appellant, Thompson became angry at having to leave the party and began assaulting her while she was attempting to exit the neighborhood. Witnesses James Black and Rachel Canine saw this altercation occurring and, although neither individual actually saw Thompson hit Appellant, Appellant and Thompson were moving their hands in a way that made them believe the conflict was physical. This prompted Canine to pull behind Appellant and call 911. Meanwhile, Black attempted to approach Appellant's vehicle on foot, but when Appellant saw him through her rearview mirror, she turned her vehicle around and headed back toward her father's home.

Appellant testified that she had decided go back to her father's to report Thompson's behavior. However, when Thompson allegedly promised her he would stop, she turned the car back around and again attempted to drive to her home. Witnesses Jonathan Hayes, Gilbert Robbins, and Cleona Mills noticed Appellant run a stop sign after she attempted to exit the neighborhood a second time. Each witness estimated that Appellant's vehicle was traveling above the twenty-five-mile-per-hour speed limit. According to Robbins, Appellant decelerated through the stop sign, looked toward him, and then sped away. Robbins testified that it sounded like Appellant gave her vehicle "all the gas she could."[1]

At the same time, three children (Rayshon Green, Larome White, and Dylan Geitgey) were riding their bikes in the neighborhood. White and Green were attempting to cross the street and enter the sidewalk when Green's bicycle chain popped off. At this point, Geitgey was riding behind them, attempting to catch up.

As Green leaned over to fix his chain, he saw Appellant's car speed toward him, and as he later testified, it came so close to hitting him that he felt the air from the vehicle's movement as it passed.[2] Appellant's vehicle, however, swerved and hit Geitgey.[3] Geitgey was thrown approximately sixty-nine feet. After hitting Geitgey, Appellant's vehicle crashed into Judy Crump's home, causing damage to her garage and two vehicles parked in the driveway.[4]

---

1. Mere seconds later, Hayes and Robbins heard a collision.

2. White corroborated Green's testimony, stating that Appellant's vehicle barely missed Green as it passed.

3. As will be discussed below, Green believed Geitgey was on the sidewalk at the time of the collision, but Officer Greg Raque testified that he believed Geitgey was in the center of the road when Appellant struck him on his right side.

4. Crump testified that, as a result of the collision, her home and vehicles incurred thousands of dollars worth of damage. When a tow truck attempted to remove Appellant's car from her property, Crump noticed a beer bottle on the ground. Appellant later admit-

After emergency personnel arrived and Geitgey had been securely placed into an ambulance, Sergeant Timothy Howell spoke to Appellant. He testified that she was unresponsive, unsteady on her feet, smelled of alcohol, and that her eyes were glassy. Given these observations, Howell testified that she appeared to be intoxicated. Thereafter, two EMTs transported Appellant to the hospital. Both testified that Appellant was belligerent and smelled of alcohol. According to one of the EMTs, Appellant admitted she had had a couple of drinks.

Lauren Ashley Lincoln, a hospital nurse, triaged Appellant at the hospital. She testified that Appellant was belligerent, smelled of alcohol, and told her that she had had a couple of drinks. When Lincoln asked her if she had been assaulted, Appellant replied that she had not. Dr. William Compton, the emergency room physician, also testified that Appellant smelled of alcohol, exhibited horizontal gaze nystagmus (an eye condition indicative of alcohol intoxication), and that she told him she had a couple of drinks.

Officer Buddy Van Cleave, who was at the hospital awaiting Appellant's arrival, spoke with Appellant after she was placed in a room. When he asked her to submit to a portable breathalyzer test, Appellant replied: "My father told me not to talk to the f——n' police, see my attorney." Officer Van Cleave then left the hospital, collected information from other investigators,[5] and obtained a search warrant for samples of Appellant's blood. After three samples were taken, Appellant was released from the hospital.

Dr. Bill Smock, the Commonwealth's expert, later analyzed the blood samples. In Dr. Smock's opinion, Appellant's blood alcohol level was between .23 and .26 when she struck Geitgey with her vehicle and, according to Smock, Appellant would have had to consume 7.6 beers to reach that level of intoxication. Appellant later admitted to having consumed around six beers and stated that she was under the influence of alcohol at the time of the collision.

Geitgey died the next day. Appellant was then taken into custody and formally charged with murder, first-degree wanton endangerment, first-degree criminal mischief, driving under the influence, and tampering with physical evidence. The jury subsequently found Appellant guilty on all counts except the tampering with physical evidence charge, and the trial court adopted the jury's recommended sentence of thirty-five years' imprisonment.

Further facts will be developed as required.

## II. ANALYSIS

### A. Right to Remain Silent

Appellant first argues that her Fifth Amendment privilege against self-incrimination was violated when the trial court failed to properly exclude portions of the testimony from two police Officers that contained impermissible references to her assertion of her right to remain silent.[6]

Prior to trial, the trial court denied Appellant's motion to exclude Officer Van Cleave's testimony concerning Appellant's invocation of her right to remain silent based on its finding that she was not in

---

ted at trial that the beer bottle belonged to her.

**5.** Detective Justin Howard and Officer David Bassler were also at the hospital that night

and testified that Appellant was belligerent and smelled of alcohol.

**6.** The officers were Officer Van Cleave and Sergeant Howell.

custody when Van Cleave questioned her. During trial, Appellant moved for a mistrial after Sergeant Howell commented on her silence when explaining her demeanor after the collision. Finding that Appellant was not in custody during this exchange, the trial court denied this motion as well.

We review the trial court's denial of Appellant's motions for an abuse of discretion. *See Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000) ("[A]buse of discretion is the proper standard of review of a trial court's evidentiary rulings."); *Star v. Commonwealth*, 313 S.W.3d 30, 37 (Ky.2010) ("On review of the denial of a motion for a mistrial, the applicable standard is abuse of discretion."). "[T]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear*, 11 S.W.3d at 581.

### 1. Officer Van Cleave's Testimony

As to Officer Van Cleave's testimony, we must make two determinations: First, we must determine whether the trial court abused its discretion in permitting Officer Van Cleave to testify as to Appellant's pre-custody, pre-*Miranda* invocation of her right to remain silent. *See Goodyear*, 11 S.W.3d at 577. Because we find that it did, we must also determine whether the trial court's error was harmless beyond a reasonable doubt. *See Winstead v. Commonwealth*, 283 S.W.3d 678, 689 n. 1 (Ky. 2009) (*citing Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); RCr 9.24.

### a. Abuse of Discretion

As previously mentioned, Officer Van Cleave testified that when he arrived at the hospital and requested that Appellant submit to a portable breathalyzer test, she responded: "My father told me not to talk to the f——n' police, see my attorney." Although not an ideal statement, Appellant's chosen method of invoking her right to remain silent was effective, as the invocation of the right is afforded a liberal construction and does not require any specific combination of words to garner its protection. *See Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Quinn v. United States*, 349 U.S. 155, 162, 75 S.Ct. 668, 99 L.Ed. 964 (1955). At the time she made the statement, Appellant was not in custody and had not been read her *Miranda* rights. The issue, however, does not concern whether Appellant invoked her right, but whether Appellant's pre-arrest, pre-*Miranda* invocation of her Fifth Amendment right to remain silent arising out of official compulsion may be used in the Commonwealth's case-in-chief. We hold that it may not.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), announced a prophylactic means of protecting the privilege against self-incrimination by mandating that certain warnings be recited to a criminal suspect before being subjected to a custodial interrogation.[7] *Id.* at 444, 86 S.Ct. 1602. Specifically, prior to questioning, the suspect must be informed of her right to remain silent (among others). The officer's failure to tender *Miranda* warnings to a suspect subjected to a custo-

---

**7.** "Custodial Interrogation" is generally defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

dial interrogation can lead to the inadmissibility of their ensuing statements in the Commonwealth's case-in-chief.[8] *Id.*

Prior to the *Miranda* decision, the Court held in *Griffin v. State of California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), "that the Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615, 85 S.Ct. 1229. Since *Griffin,* the admissibility of a suspect's silence has been discussed with reference to *Miranda.* For instance, the Supreme Court in *Wainwright v. Greenfield* held that the government's use of a defendant's post-arrest, post-*Miranda* silence in its case-in-chief violated due process. 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

The Court has also had several opportunities to weigh in on the use of a defendant's silence for impeachment purposes. In *Jenkins v. Anderson,* the Court held that a criminal defendant's pre-arrest, pre-*Miranda* silence *may be used* for impeachment and not run afoul of the Fifth Amendment or due process. 447 U.S. 231, 238, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (emphasis added). It has also held that impeachment through the use of post-arrest, pre-*Miranda* silence is not contrary to due process. *Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). However, the Court in *Doyle v. Ohio* held that impeachment through the use of post-arrest, post-*Miranda* silence does indeed violate due process. 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Because *Miranda* warnings contain an "implicit assurance" that "silence will carry no penalty," the Court reasoned that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

Nevertheless, the Court has yet to resolve the issue in this case—whether a defendant's pre-arrest, *pre-Miranda* silence may be utilized in the Commonwealth's case-in-chief and not run afoul of the Fifth Amendment—and currently there exists a split among the Federal Circuit Courts of Appeals as to how the issue should be resolved.[9]

---

8. However, statements made in violation of *Miranda* are admissible for impeachment purposes if their "trustworthiness ... satisfies legal standards...." *Mincey v. Arizona,* 437 U.S. 385, 386, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal citations omitted).

9. The First, Sixth, Seventh, and Tenth Circuits have definitively prohibited the prosecution from admitting a criminal defendant's pre-arrest, pre-*Miranda* silence as substantive evidence of guilt. *See Coppola v. Powell,* 878 F.2d 1562, 1568 (1st Cir.1989); *Combs v. Coyle,* 205 F.3d 269, 283–84 (6th Cir.2000); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1017–18 (7th Cir.1987); *United States v. Burson,* 952 F.2d 1196, 1200–01 (10th Cir. 1991). *See also United States v. Caro,* 637 F.2d 869, 876 (2d Cir.1981) ("[W]e are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was

arrested or taken into custody to be used in the Government's case in chief.").

The D.C. Circuit has stated that "custody" "is the triggering mechanism for the right of pretrial silence under *Miranda."* *United States v. Moore,* 104 F.3d 377, 385 (D.C.Cir. 1997) (holding that the admission of a defendant's post-arrest, pre-*Miranda* silence in the prosecution's case-in-chief violates the Fifth Amendment because the defendant was in custody).

The Fourth, Eighth, and Eleventh Circuits have come to different conclusions. *See United States v. Love,* 767 F.2d 1052, 1063 (4th Cir.1985) (holding defendant's post-arrest, pre-*Miranda* silence to be admissible in the prosecution's case-in-chief and therefore, essentially holding a defendant's pre-arrest, pre-*Miranda* silence to be admissible as well); *United States v. Frazier,* 408 F.3d 1102, 1111 (8th Cir.2005) (holding that the defendant's

Section 11 of Kentucky's Constitution states, in pertinent part: "In all criminal prosecutions the accused ... cannot be compelled to give evidence against himself...." This Court, in interpreting Section 11, as well as the Fifth Amendment, has found error where a defendant's post-arrest, pre-*Miranda* silence has been admitted in the Commonwealth's case-in-chief. *See Green v. Commonwealth,* 815 S.W.2d 398, 400 (Ky.1991). In *Green,* we stated that "[t]he giving of a *Miranda* warning does not suddenly endow a defendant with a new constitutional right. The right to remain silent exists whether or not the warning has been or is ever given. The warning is required not to activate the right secured, but to enable citizens to knowingly exercise or waive it." *Id.* And in *Hall v. Commonwealth,* we noted that "[i]t is clear that the prosecution is prohibited from using the defendant's silence in its case-in-chief." 862 S.W.2d 321, 323 (Ky.1993) (*citing Doyle,* 426 U.S. at 610, 96 S.Ct. 2240). However, it is unclear whether the defendant's silence in *Hall* was utilized in the pre-*Miranda* or post-*Miranda* context. *See id.*

■ *Green* and *Hall* seem to suggest that the Commonwealth may never introduce evidence of a defendant's silence in its case-in-chief. However, both the Fifth Amendment and Section 11 state that an individual cannot be "compelled" to incriminate herself. Thus, official compulsion must be present in order for the privilege against self-incrimination to attach. *See Jenkins,* 447 U.S. at 241, 100 S.Ct. 2124 (Stevens, J., concurring) ("[T]he privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak.").

■ Because official compulsion is required for the privilege to attach, the next question we must ask is whether an individual may be officially compelled outside of a custodial setting. *Miranda* warnings are required to be given because compulsion is inherent in a custodial environment. *See Miranda,* 384 U.S. at 532, 86 S.Ct. 1602. ("[T]he core of the Court's opinion is that because of the compulsion inherent in custodial surroundings, no statement obtained from [a] defendant [in custody] can truly be the product of his free choice ... absent the use of adequate protective devices as described by the Court.") (White, J., dissenting) (internal citation and quotation marks omitted). *Miranda* did not, however, hold that official compulsion is present only when a suspect is placed into custody. *See Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

■ Here, Appellant was not officially compelled to incriminate herself when Officer Van Cleave, suspecting that she

post-arrest, pre-*Miranda* silence was admissible in the government's case-in-chief because there was no official compulsion. The court qualified its holding, stating "[w]e do not decide today whether compulsion may exist under any other postarrest, pre-*Miranda* circumstances"); *United States v. Rivera,* 944 F.2d 1563, 1568 (11th Cir.1991) (holding that the government may comment on a defendant's pre-arrest, pre-*Miranda* silence, as well as his post-arrest, pre-*Miranda* silence).

The Fifth Circuit has held that a defendant's pre-arrest, pre-*Miranda* silence may be admitted in the government's case-in-chief. *United States v. Zanabria,* 74 F.3d 590, 593 (5th Cir.1996). The court's decision was based on a lack of compulsion by the government. *See id.* ("[T]he record makes manifest that the silence at issue was neither induced by nor a response to any action by a government agent. The [F]ifth [A]mendment protects against compelled self-incrimination but does not ... preclude the proper evidentiary use and prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference.").

had been drinking, asked her to submit to a breathalyzer test.[10] However, in response, Appellant voiced, at most, her intent to remain silent, and at least, her refusal to submit to the test. While the *fact* of Appellant's refusal is fully admissible at trial, *see Commonwealth v. Hager*, 702 S.W.2d 431, 432 (Ky.1986) ("[T]he admission into evidence of a defendant's refusal to submit to a blood alcohol test does not offend his Fifth Amendment right against self-incrimination....") (*citing South Dakota v. Neville*, 459 U.S. 553, 564, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)), the Commonwealth sought, and the trial court allowed, the introduction of Appellant's *entire* statement. The phrasing and language employed by Appellant in refusing the breathalyzer test was not indicative of guilt and was both irrelevant and unduly prejudicial. *See* Kentucky Rules of Evidence (KRE) 403.[11] Accordingly, the trial court abused its discretion in permitting the Commonwealth to introduce Appellant's entire statement.[12]

### b. Harmless Beyond a Reasonable Doubt

▆ Having found error, we must determine whether the error was harmless. Although we found above that Appellant's constitutional rights were not impinged, even if we assume, for the sake of argument, that the Commonwealth's introduction of Appellant's statement was constitutionally infirm, it was undoubtedly harmless beyond a reasonable doubt. *Winstead,* 283 S.W.3d at 689 n. 1 (*citing Chapman,* 386 U.S. at 24, 87 S.Ct. 824 ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.")); RCr 9.24. Thus, we ask whether "absent [Officer Van Cleave's testimony as to Appellant's silence], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (citation omitted). The consideration of three factors will aid in our determination: "(1) the extent of comments made by the witness, (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting the defendant's guilt." *United States v. Velarde–Gomez,* 269 F.3d 1023, 1034 (9th Cir.2001) (internal citation omitted).

First, Officer Van Cleave testified that after he asked Appellant to submit to a portable breathalyzer test, Appellant stated: "My father told me not to talk to the

---

10. Indeed, the privilege against self-incrimination "does not extend to demonstrative, physical or real evidence." *Sholler v. Commonwealth,* 969 S.W.2d 706, 711 (Ky.1998). In the context of a request for submission to a breathalyzer test, this Court has held that "no person may be compelled to testify against himself in any criminal matter but the taking of finger prints, blood samples and *breath for chemical analysis* are in fact searches of the person for evidence rather than a compulsion of testimony." *Newman v. Stinson,* 489 S.W.2d 826, 829 (Ky.1972) (emphasis added). In *Newman*, this Court went on to note "that Fifth Amendment rights are not involved in the taking of breath samples for chemical analysis." *Id.*

11. We would note that in *Neville,* the Supreme Court of the United States allowed the defendant's entire statement of refusal to be admitted. However, in that case the defendant stated, "I'm too drunk, I won't pass the test." This statement is clearly relevant and evidences guilt in the DUI context. We are not presented with such a statement in this case.

12. Having found no official compulsion in this case, we reserve for another day whether a defendant's pre-arrest, pre-*Miranda* silence may be utilized in the Commonwealth's case-in-chief.

f——n' police, see my attorney." Second, Appellant's silence was not stressed to the jury, as the Commonwealth made no mention of Officer Van Cleave's testimony during its closing argument, or elsewhere.

Third, the other evidence suggesting Appellant's guilt was more than extensive.[13] Before the collision, Appellant admitted that she had consumed around six beers and was under the influence of alcohol. Dr. Smock estimated that Appellant's blood alcohol level at the time of the collision was in the range of .23–.26 based on the three samples of her blood taken at the emergency room that night. Several other witnesses who encountered Appellant after the collision testified that Appellant appeared to be intoxicated.[14]

As to the accident itself, Hayes and Robbins both testified that Appellant was speeding when she approached the intersection and rolled through the stop sign. Hayes estimated her speed to be at around 30–45 miles per hour, while Robbins stated

that Appellant looked in his direction, revved her engine, and seemed to give the car "all the gas she could" as she continued past them. Although neither witness could see the collision, seconds later they both heard it.

Green was a short distance down the street when he heard people shouting at Appellant to slow down and subsequently saw her car coming toward him. Appellant's vehicle came so close to hitting Green that he felt the wind of the car as it passed. White testified that the car barely missed Green, swerved, and then collided with Geitgey.

Officer Raque, a trained accident-scene reconstructionist, testified that the yaw marks found at the scene were likely the result of Appellant over-steering to avoid hitting Green. It was Raque's opinion that Geitgey was in the middle of the street when Appellant struck him on his right side.[15] Geitgey was thrown approximately sixty-nine feet and, based on that distance,

---

**13.** Under KRS 507.020, "[a] person is guilty of murder when ... [i]ncluding, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person."

Pursuant to KRS 508.060, "[a] person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person."

Under KRS 512.020, "[a] person is guilty of criminal mischief in the first degree when, having no right to do so or any reasonable ground to believe that he has such right, he intentionally or wantonly defaces, destroys or damages any property causing pecuniary loss of $1,000 or more."

"A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial

and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto." KRS 501.020.

The crime of driving under the influence is detailed in KRS 189A.010. We also note that Appellant was also charged with tampering with physical evidence. However, Appellant was acquitted of this charge and thus, discussion of the crime's elements in relation to Appellant's use of profanity is unnecessary.

**14.** Nurse Lincoln, Dr. Compton, Officer Van Cleave, Sergeant Howell, and Officer Bassler all testified that Appellant exhibited characteristics of intoxication.

**15.** As noted, Green testified that he thought Geitgey was on the sidewalk when Appellant hit him with her vehicle.

Raque estimated that Appellant was traveling anywhere from 32 to 45 miles an hour at the time of impact. During cross-examination, Appellant—while stating that she believed she was driving no more than 30 miles an hour—admitted that she was aware that the speed limit was twenty-five miles an hour. She also conceded that she was very familiar with the neighborhood and knew a lot of children played outside.[16]

As a result of the collision, Dr. Amy Burrows–Beckham, who performed the autopsy on Geitgey, testified that he died from blunt force trauma and blood loss. Crump testified her home and vehicles incurred thousands of dollars worth of damage. Appellant, however, asserts that Thompson caused the collisions by assaulting her immediately before she hit Geitgey and Crump's property. The evidence and circumstances of the case suggest otherwise.

First, although Black and Canine thought that they may have witnessed Appellant and Thompson in a physical altercation before she attempted to head back towards her father's home, Robbins's testimony suggests that the argument between Appellant and Thompson had subsided before the collision occurred.[17] Second, Appellant told Nurse Lincoln when she arrived at the hospital that she had not been assaulted. Third, photographs of Thompson's hands taken the night of the collision showed no evidence of domestic violence. Finally, it should be noted that it was the defense's decision not to make Thompson a witness.

Given the evidence, it is clear beyond a reasonable doubt that the jury's verdict would have been the same in the absence of Van Cleave's testimony. Therefore, we find the trial court's error in admitting Van Cleave's testimony regarding Appellant's invocation of her right to remain silent to be harmless beyond a reasonable doubt.

### 2. Sergeant Howell's Statement

 Sergeant Howell spoke to Appellant at the scene of the collision shortly after it occurred. When the Commonwealth asked Howell if he thought Appellant was under the influence of alcohol, Howell responded that, under the totality of the circumstances, he did. When asked to elaborate, Howell stated: "She seemed like she was unsteady on her feet, she smelled of alcohol, her eyes were a little glassy, [and] she didn't want to talk." Defense counsel then moved for a mistrial based on Howell's comment concerning Appellant's silence and the trial court subsequently denied the motion.

 Again, we review the trial court's decision for an abuse of discretion. *Star*, 313 S.W.3d at 37. However, "[a] mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity." *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky.2005), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010). The error must be " 'of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way [except by grant of a mistrial].' " *Bray*, 177 S.W.3d at 752

---

**16.** Robbins estimated that anywhere from twenty to thirty different children would ride their bikes in the Fincastle neighborhood on a given weekend.

**17.** Robbins testified that Appellant looked directly at him mere seconds before the crash. This tends to show that if a fight did occur, it had subsided seconds before the collision occurred.

(*quoting Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky.1996)).

In the case at bar, a manifest necessity for granting a mistrial does not exist despite the trial court's error in admitting Appellant's silence. The prejudicial effect of Howell's testimony concerning Appellant's desire not to speak with him shortly after the accident is minimal given the extensive evidence of guilt presented by the Commonwealth, as detailed in II. A. 1. b., *supra.* Thus, the trial court did not commit reversible error.

## B. Police Video

 Appellant's next argument, which is unpreserved, is that the trial court committed reversible error by permitting the. introduction of a video taken from Officer Bassler's police vehicle. Specifically, Appellant argues that the contents of the video were cumulative and unduly prejudicial, and thus, the trial court's failure to prohibit the video's introduction under KRE 403 violated Appellant's due process rights.

 Although this issue is unpreserved, we invoke our authority to review for palpable error. RCr 10.26. We will reverse under the palpable error standard only when a "manifest injustice has resulted from the error." RCr 10.26. "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006). When we engage in palpable error review, our "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5.

 Under KRE 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice ... or needless presentation of cumulative evidence." Here the video evidence was relevant, as it offered a more accurate description of the crime scene than what could be depicted by the witnesses' testimony. *See Wheeler v. Commonwealth,* 121 S.W.3d 173, 183 (Ky.2003). Officer Bassler's route to the crime scene was similar to Appellant's journey from her step-father's home. The video showed the residential nature of the neighborhood, including the presence of several stop signs located in the area. It also portrayed the weather conditions on the day of the collision—illustrating it occurred on an evening in which there would have been no issue with Appellant's visibility.

As to the danger of undue prejudice, we note that "[w]e have previously held that a video tape of a crime scene, including the position of the victim's body and nature of the victim's injuries, is ... admissible ... even though the scene depicted may be gruesome." *Young v. Commonwealth,* 50 S.W.3d 148, 169 (Ky.2001) (*citing Bedell v. Commonwealth,* 870 S.W.2d 779 (Ky.1993); *Milburn v. Commonwealth,* 788 S.W.2d 253 (Ky.1989)). Although prejudice is inherent in any evidence depicting a crime scene of this nature, we cannot say that it substantially outweighed the probative value. KRE 403.

 Further, we find that the evidence was not needlessly cumulative. Although Officer Bassler repeated much of the testimony he had given when narrating the video presentation to the jury, he was merely reinforcing how the events unfolded in real time. Additionally, even though the accident scene had been detailed through the testimony of several other witnesses, the video evidence provided a more accurate account of the crime scene. Thus, the admission of the video was not

an error, let alone one that may be defined as palpable.

## C. The 911 Recording

■ Shortly after the collision, Crump called 911. During the recorded call, Crump detailed the events that had just taken place (that there had been a collision in which a boy had been seriously injured). During the call, the 911 operator instructed Crump to go outside and check on Geitgey. She informed the operator that Geitgey was not moving and asked that emergency personnel please hurry. Shortly thereafter, screams from Geitgey's mother could be heard as she arrived on the scene. The operator asked Crump to try to keep everyone calm for Geitgey's sake. When emergency personnel arrived, the conversation, which lasted only a few minutes, ended.

When the Commonwealth sought to introduce the recording, defense counsel objected on the grounds that it was irrelevant. The trial court subsequently overruled the objection. Appellant now argues that under KRE 403, the 911 recording was unduly prejudicial and cumulative. After review, we find that the trial court did not abuse its discretion in permitting the Commonwealth to introduce the 911 tape. *See Goodyear*, 11 S.W.3d at 577 (applying the abuse of discretion standard to a trial court's evidentiary rulings).

The recording was highly relevant for many of the same reasons highlighted in Section II. B., *supra*. By illustrating the time that elapsed from the initiation of the phone call until the police arrived, the recording aided the jury in providing a timeline of events. Moreover, it gave the jury a more accurate description of what actually happened rather than just the recollections provided from those who were present that day.

Some prejudice does arise from the introduction of the recording given its contents. However, such prejudice does not substantially outweigh the probative value of the evidence, as detailed above. Further, the evidence, while at times duplicative, was not needlessly cumulative, as it provided a real-time depiction of the events that occurred shortly after the collision. Thus, the trial court did not abuse its discretion in admitting the 911 tape.

## D. Profanity

■ Appellant's next argument is that the trial court abused its discretion by denying her motion in limine to exclude her use of profanity as irrelevant character evidence. After the trial court denied Appellant's motion, several witnesses testified that Appellant consistently used profane language when speaking with them after the collision. The Commonwealth, in reply, argues that Appellant's use of profanity was relevant in proving that she was intoxicated.

Here, even if we were to find error under either KRE 403 or KRE 404(b), we find it to be harmless. *Winstead*, 283 S.W.3d at 688–89; RCr 9.24. "A nonconstitutional evidentiary error may be deemed harmless ... if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead*, 283 S.W.3d at 688–89 (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Winstead*, 283 S.W.3d at 689 (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239).

Because we find that there was significant evidence to support the jury's findings and that any potential error that arose out of the admission of Appellant's profane statements did not have substantial influence on Appellant's convictions and sentence, we find Appellant's argument to be unpersuasive.

## E. Penalty Phase

Finally, Appellant argues that a new penalty phase is necessary because (1) the Commonwealth committed a discovery violation by introducing a prior misdemeanor conviction without disclosing to the defense its intent to do so and (2) even if this was not a discovery violation (or it was and we hold the error to be harmless), the Commonwealth improperly introduced the facts surrounding the prior conviction to Appellant's substantial prejudice.

### 1. Discovery Violation

Appellant begins by arguing that a new penalty phase is necessary because the Commonwealth committed a discovery violation warranting reversal and remand. Specifically, Appellant argues that if the Commonwealth properly disclosed its intention to introduce Appellant's theft by deception conviction, her sentence would have been different. We agree that the Commonwealth committed a discovery violation by failing to notify Appellant of its intent to introduce the conviction. However, we hold that sufficient justification does not exist for remand.

The trial court's discovery order, pursuant to RCr 7.24, required the Commonwealth to produce all discoverable material to Appellant within thirty days of its issuance. The order further specified that, pursuant to RCr 7.28, the parties were under a continuing obligation to provide discoverable material to each other. Included in the Commonwealth's initial response to the court's order were two of Appellant's previous convictions (for driving under the influence and for terroristic threatening) intended to be introduced against Appellant during the sentencing phase.

During the sentencing phase, however, the Commonwealth indicated that it would also introduce Appellant's misdemeanor conviction for theft by deception under $300. Appellant objected, arguing that the conviction was inadmissible because the Commonwealth failed to provide it in discovery. The trial court overruled Appellant's objection on the ground that the conviction's introduction was not overly prejudicial. The jury then learned that Appellant was convicted of theft by deception for writing a bad check to a liquor store.

RCr 7.24(2) states:

The court may order the attorney for the Commonwealth to permit the defendant to inspect and copy or photograph books, papers, documents or tangible objects, or copies or portions thereof, that are in the possession, custody or control of the Commonwealth, upon a showing that the items sought may be material to the preparation of the defense and that the request is reasonable. This provision authorizes pretrial discovery and inspection of official police reports, but not of memoranda, or other documents made by police officers and agents of the Commonwealth in connection with the investigation or prosecution of the case, or of statements made to them by witnesses or by prospective witnesses (other than the defendant).

Pursuant to the trial court's order, Appellant was entitled to production of the theft by deception conviction before her trial began. We reject the Commonwealth's assertion that no error occurred because

Appellant was aware of her prior conviction. We have stated that the premise underlying RCr 7.24 is not only to inform the defendant of her prior convictions (of which she should be aware), but to inform her that the Commonwealth has knowledge thereof. *See Chestnut v. Commonwealth,* 250 S.W.3d 288, 297 (Ky.2008). "This ensures that the defendant's counsel is capable of putting on an effective defense, as per the intent of the rule." *Id.* Thus, disclosure was proper, as "[a] cat and mouse game whereby the Commonwealth is permitted to withhold important information requested by the accused cannot be countenanced." *James v. Commonwealth,* 482 S.W.2d 92, 94 (Ky.1972).

 However, we find no abuse of discretion because the Commonwealth's failure to properly disclose the prior conviction was not prejudicial. *See Beaty v. Commonwealth,* 125 S.W.3d 196, 202 (Ky. 2003) (finding that the trial court did not abuse its discretion because no prejudice occurred). "[A] discovery violation serves as sufficient justification for setting aside a conviction when there is a reasonable probability that if the evidence were disclosed the result would have been different." *Chestnut,* 250 S.W.3d at 297 (internal citations omitted). Appellant argues that had the evidence been disclosed, the jury's sentence, as well as her defense, would have been different. We find her argument unpersuasive.

First, it is unlikely that the exclusion of the theft by deception conviction would have altered the jury's sentence. At the sentencing phase, not only was the jury informed that Appellant had been convicted of theft by deception, but it also learned about Appellant's prior driving under the

influence and terroristic threatening convictions. The jury recommended Appellant serve her other sentences concurrently with the sentence recommended for wanton murder. The statutory minimum sentence the jury could recommend for Appellant's conviction for wanton murder was twenty years, while the maximum was fifty years to life. See KRS 532.030.[18] The jury's actual recommended sentence—which the trial court adopted—was thirty-five years. Given the highly prejudicial nature of Appellant's two prior (and properly admitted) convictions, as well as the jury's proposed sentence in relation to the maximum it could have prescribed, we cannot say that the exclusion of the theft by deception conviction would have led the jury to recommend a more favorable sentence.

Second, we are not convinced that had the conviction been disclosed, the Appellant would have defended herself in a different manner. Appellant argues that had she known that the Commonwealth intended to introduce her prior misdemeanor theft conviction, she might have accepted the Commonwealth's plea offer or instituted a different defense strategy. As to her defense, she argues that the disclosure might have changed her counsel's advice as to whether she should have testified during the sentencing phase and counsel's method of questioning her.

However, when Appellant made the court aware of the Commonwealth's non-disclosure, she did not request a continuance in order to re-evaluate how she should proceed. Further, it is difficult to accept that Appellant's knowledge of the Commonwealth's intent to introduce the theft by deception conviction—given the

**18.** Under KRS 507.020, wanton murder is defined as a capital offense. KRS 532.030 states, in pertinent part: "When a person is convicted of a capital offense, he shall have his punishment fixed at ... a sentence of life, or to a term of not less than twenty (20) years nor more than fifty (50) years."

fact that she was aware the Commonwealth would introduce the other more prejudicial convictions—would have changed her defense strategy. Thus, the Commonwealth's discovery violation does not justify vacating Appellant's sentence because even if Appellant's theft by deception conviction was properly disclosed, a reasonable probability does not exist that the result of her trial would have been different. *See Chestnut,* 250 S.W.3d at 297.

### 2. Inadmissible Evidence of Appellant's Prior Conviction

 Appellant finally argues that the facts surrounding her theft by deception conviction—specifically, the fact that her conviction was the result of her writing a bad check to a liquor store—should not have been admitted into evidence. We agree with Appellant, as "the evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed." *Mullikan v. Commonwealth,* 341 S.W.3d 99, 109 (Ky.2011) (discussing KRS 532.055(2)(a): "Evidence may be offered by the Commonwealth relevant to sentencing including ... prior convictions of the defendant, both felony and misdemeanor [and t]he nature of prior offenses for which he was convicted.").

 However, Appellant makes this argument for the first time on appeal. An appellate court "is without authority to review issues not raised in or decided by the trial court." *Reg'l Jail Auth. v. Tackett,* 770 S.W.2d 225, 228 (Ky.1989); *Matthews v. Ward,* 350 S.W.2d 500 (Ky.1961). Further, although we find that the victim of Appellant's theft by deception conviction should not have been identified, we hold that the trial court did not commit palpable error. RCr 10.26.

### III. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions and sentences.

All sitting. All concur.

### ORDER GRANTING PETITION FOR MODIFICATION

This matter is before the Court on the Appellee's Petition for Modification, filed December 11, 2012, of the Opinion of the Court by Justice Scott, rendered November 21, 2012. Having reviewed the record and being otherwise fully and sufficiently advised, the Court ORDERS:

The Appellee's Petition for Modification is GRANTED; and the Opinion of the Court by Justice Scott, rendered November 21, 2012, is MODIFIED on its face and WITHDRAWN; and the attached opinion is SUBSTITUTED therefor. The modification does not affect the holding.

All sitting. All concur.

ENTERED: May 23, 2013.

/s/ John D. Minton, Jr.

**M.A.M., Appellant**