# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 25, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0471-MR

DEANGELO POLLARD                                                    APPELLANT

V.
ON APPEAL FROM HENDERSON CIRCUIT COURT
HONORABLE KAREN LYNN WILSON, JUDGE
NO. 18-CR-00072

COMMONWEALTH OF KENTUCKY                                            APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

DeAngelo Pollard appeals as a matter of right[1] after being convicted of complicity to first-degree robbery and sentenced to twenty-years imprisonment. Pollard raises four trial-based challenges in his appeal: failure to direct a verdict of acquittal, a *Batson*[2] violation, discovery violations, and cumulative error. Finding none of these challenges meritorious, we affirm the Henderson Circuit Court's judgment.

## I. Factual and Procedural Background

In November 2017, Devin Fields, with a friend, Charles Olson, drove to Henderson, Kentucky. Olson testified that Fields' intent was to sell marijuana. Eventually, they met Keandre Tapp and Z.G., a juvenile, in a park. Tapp and Z.G. advised that they needed a ride to their brother's apartment to get money.

---

[1] Ky. Const. § 110(2)(b).

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

These four then got in Fields' car: Fields drove, Olson sat in the front passenger seat, with Tapp and Z.G. in the back. When they arrived at their destination, Tapp and Z.G. exited the vehicle. According to Olson, three people got in the back of the car 5 to 10 minutes later. Fields then started laying out marijuana on the front center console. At that point, Olson felt a gun at the back of his head with a warning not to move. A scuffle ensued over the marijuana, and someone from the back seat shot Fields fatally in the chest. Olson did not know who fired the shot but believed it came from the back center or back right.

Tapp testified at trial. He had never met Fields prior to the day in question, but had communicated with him through Snapchat, learned Fields would be travelling through Henderson and discussed buying marijuana from Fields. Tapp was, however, good friends with Z.G. and Pollard. He told them of his plan to buy marijuana, but that Pollard wanted to rob Fields, taking the marijuana instead. Tapp's testimony corroborated Olson's testimony about the initial meeting, driving to the other apartment complex, and Tapp and Z.G. exiting the vehicle. When Tapp and Z.G. with Pollard returned to Fields' car, Tapp and Pollard were armed; Tapp had a .22 revolver and Pollard had a silver and black .38 special. Tapp sat behind Fields, Z.G. was in the center back, and Pollard was behind Olson. When Fields displayed the marijuana, Tapp and Pollard revealed their guns. Tapp testified that, in the fight over the marijuana, Pollard shot Fields after Fields grabbed Tapp's revolver. Immediately following the shooting, Pollard and Tapp exited the vehicle and fled. Tapp acknowledged making a plea bargain in exchange for his testimony.

2

Z.G. testified about his involvement. He testified that he was very close to Tapp, but only knew Pollard as an acquaintance. His testimony corroborated that of Olson and Tapp as to the initial meeting and driving to the other apartment complex, although he denied initial knowledge of the marijuana transaction/robbery. He corroborated Tapp's account of returning to Fields' car with Pollard, but that when Z.G. realized something bad was about to happen, he said he had to go to the bathroom and got out of the car. Z.G. testified that he saw Tapp and Pollard pull their guns, the scuffle, and then Pollard shoot Fields.

Following a police investigation which implicated Tapp and Pollard, Pollard was arrested. The Henderson Circuit Court grand jury indicted Pollard on two counts: a) murder and b) first degree robbery and/or complicity to first degree robbery. At trial, the jury acquitted Pollard of murder, but convicted him of complicity to first degree robbery. The trial court imposed the jury's recommended sentence of twenty-years imprisonment.

Pollard appeals as a matter of right. Ky. Const. § 110(1)(b). Further facts will be set forth as necessary to address Pollard's arguments on appeal.

## II. Analysis

Pollard makes four arguments in his appeal. 1) The trial court erred in denying his motion for directed verdict since no witness explicitly identified Pollard in the courtroom as the person who robbed Fields. 2) The trial court erred in denying Pollard's motion for a new trial based on a *Batson* violation. 3) The trial court erred in failing to grant any relief for the Commonwealth's

3

discovery violations. And 4) cumulative errors in the trial warrant a new trial.

We address each of these claims in turn.

### A.      Denial of Motion for Directed Verdict.

In *Culver v. Commonwealth*, 590 S.W.3d 810, 812–13 (Ky. 2019), we

stated,

> On the motion for a directed verdict, the single controlling question for the trial court is whether the Commonwealth has sustained the burden of proof by more than a scintilla of evidence, with such evidence being of probative value and of the quality to induce conviction in the minds of reasonable men. *James v. England*, 349 S.W.2d 359, 361 (Ky. 1961) (citation omitted). When the evidence is insufficient to induce reasonable jurors to believe beyond a reasonable doubt that a defendant is guilty, a verdict may be directed. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). When assessing the evidence, the trial court must consider the Commonwealth's evidence as a whole, assume the evidence is true, and draw all reasonable inferences from the evidence in favor of the Commonwealth. *Id.* The trial court may not consider questions of weight and credibility, those being the province of the jury. *Id.*

Our standard of review on such an issue is "if under the evidence as a whole, it

would be clearly unreasonable for a jury to find guilt, only then the defendant

is entitled to a directed verdict of acquittal." *Ray v. Commonwealth*, 611

S.W.3d 250, 266 (Ky. 2020) (quoting *Commonwealth v. Benham*, 816 S.W.2d

186, 187 (Ky. 1991)).

Pollard argues that he was entitled to a directed verdict in this case

because no one specifically identified him at trial. While the trial court

acknowledged that no witness "pointed a finger" at Pollard and no one ever

identified the person sitting at counsel table as DeAngelo Pollard, it

nevertheless found that enough testimony and evidence by other means was

adduced to overrule the motion. On the morning of the first day of trial, during

4

voir dire, Pollard's own counsel identified him to the jury. Thereafter, during trial, Tapp's and Z.G.'s testimony provided ample identifying information that was unique to Pollard. Tapp testified to Pollard's nickname, stated that he had known Pollard for a long time and that the two were good friends. Tapp testified that he knew the weapon Pollard used to help him rob and ultimately kill Fields. Afterwards, the Commonwealth called Z.G. to testify and asked him similar biographical information about Pollard. Z.G. noted that while he was not close friends with Pollard, the two were friendly and that Z.G. and Tapp had been friends since elementary school. Following their direct testimony, Pollard's counsel conducted vigorous cross-examination of both witnesses.

We hardly need authority to state that convictions may be based on circumstantial evidence. *E.g., Rogers v. Commonwealth*, 315 S.W.3d 303, 311 (Ky. 2010). Even in the absence of a "finger point," whom would Tapp and Z.G. have been testifying about? Consequently, the jury was properly presented with ample evidence that the young man sitting at the defense table was the same Pollard whom Tapp and Z.G. spoke about and identified at length. The jury could, and did, make reasonable factual conclusions regarding the defendant. We note that the jury ultimately acquitted Pollard of murder and robbery in the first degree, demonstrating its ability to observe and weigh the evidence, as was its duty. Pollard was not entitled to a directed verdict.

### B. *Batson challenge.*

When a party raises a *Batson* challenge, the trial court must engage in a three-step inquiry to determine whether a prospective juror was struck for an impermissible reason. *Commonwealth v. Snodgrass*, 831 S.W.2d 176, 178 (Ky.

1992). The first step requires the defendant to make a prima facie showing that the peremptory challenge was based on race. *Id.* After the requisite showing by the defendant, the burden shifts to the prosecution to present a race-neutral explanation for its peremptory strike. *Id.* Finally, during the last step, the trial court must determine whether the prosecutor's race-neutral explanation was sufficient, or whether the defendant's challenge had "carried his burden of proving purposeful discrimination." *Id.*

A trial court's ruling on a *Batson* challenge is treated as a finding of fact by the reviewing court. *France v. Commonwealth*, 320 S.W.3d 60, 67 (Ky. 2010) (citation omitted). Consequently, on appeal this Court will not disturb the ruling unless it was clearly erroneous. *Id.* (citation omitted). However, our deference to the trial court does not mean that we will not engage in a meaningful and independent review. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (in which the Supreme Court reiterated that courts must conduct rigorous inquiries into the proffered race neutral justifications of prosecutors to find and reject clearly pretextual offerings). As we noted in *France*, the ultimate burden of showing unlawful discrimination rests with the challenger. 320 S.W.3d at 67 (citation omitted).

In this case, the Commonwealth exercised a peremptory strike as to the last remaining African-American in the thirty-one-member venire panel. When Pollard challenged the strike, the Commonwealth advised that the juror had misrepresented on her Juror Qualification Form, specifically answering "no" to

6

the question as to whether she had been convicted of a crime.[3]  The audio portion of the video record is unclear, but apparently the Commonwealth's Attorney was questioned about his factual basis.  He is shown retreating to his table and then returning to the bench with papers which he then shows to the trial judge and defense counsel.  The attorneys and judge then appear to discuss the information presented: the juror's conviction of a crime, apparently welfare fraud, and, additionally, whether she was a Henderson County resident.  Significantly, at this point in the proceeding, all thirty-one members of the venire panel were present because immediately afterwards, the trial court directed the clerk to randomly select thirteen jury members to try the case.  But, while counsel were at the bench during the *Batson* challenge, no one thought to call the juror up to the bench for further questioning or clarification.  In his post-trial motion, as in this appeal, Pollard argued that the Commonwealth's race-neutral reason was pretextual since he had discovered that the Commonwealth's criminal record check may have uncovered a woman with a similar name[4] in a different county who had been placed on welfare fraud diversion in 2018.

---

[3] The questions on the standard Juror Qualification Form (Form AOC-005-A) request disclosure as to whether an individual is currently under indictment, currently a participant in a felony diversion or deferred prosecution program, or a convicted felon who has not been pardoned or received restoration of civil rights. AOC-005-A, Part A. 5-7.  The Form also requests a yes or no answer to the following question: "Have you or a family member been a defendant, witness or complainant in a criminal case?"  AOC-005-A, Part B.4.  The Juror at issue did not check any of the boxes in Part A, and on the yes/no question in Part B, concerning criminal case participation, checked the "no" box.

[4] The record Pollard proffers shows a woman with an identical first name and a surname which is similar but additionally has "on" at the end.  For example, the difference between "Judy Roberts" and "Judy Robertson."

7

In *Snodgrass,* we addressed the latitude afforded to prosecutors in utilizing peremptory challenges. In that case, the defendant made a *Batson* motion as to the Commonwealth's peremptory challenge of an African American juror. The Commonwealth's stated reason for the strike was that the juror did not inform the prosecutor that he lived near and had known the defendant, despite the trial court's question on that topic to the jury. 831 S.W.2d at 178. The trial court found the Commonwealth's reason sufficiently specific and race-neutral and denied the *Batson* motion. Following conviction, Snodgrass appealed the *Batson* issue, and the Court of Appeals reversed the trial court. *Id.* That Court noted that the Commonwealth failed to ask follow-up questions of the juror to ascertain whether his information was correct and "further criticized the prosecutor by stating that his decision was based upon 'intuition or information *aliunde*.[5]'" *Id.* This Court disagreed, finding no *Batson* violation and reinstating the trial court's ruling.

In coming to its conclusion, the *Snodgrass* court laid out several principles inherent to reviewing *Batson* decisions. First, the Court noted that prosecutors are free during voir dire to rely on information they receive outside of the voir dire process. *Id.* at 179. Additionally, peremptory strikes do not need to satisfy the requirements for striking jurors for cause. *Id.* Moreover, the Court stated the test for evaluating *Batson* challenges in the following terms:

---

[5] "'Aliunde' adj. [Latin] (17c) From another source; from elsewhere[.]" Black's Law Dictionary (10th ed. 2014).

**Whether the information is true or false is not the test.** The test is whether the prosecutor has a good-faith belief in the information and whether he can articulate the reason to the trial court in a race-neutral manner which is not inviolate of the defendant's constitutional rights. The trial court, as the final arbiter, then decides whether the prosecutor has acted with a forbidden intent.

*Id.* (emphasis added). Finally, the Court stated that while clarifying questions of the juror prior to exercising a peremptory strike would have been helpful, such questions were not necessary predicates. *Id.* Consequently, because the trial court was presented with two plausible arguments and had made its determination, the Court of Appeals abused its discretion when it came to a separate factual conclusion and substituted that for the trial court's finding. *Id.* at 180.[6]

Of course, limits exist to the Commonwealth's creativity in exercising peremptory challenges. *See, e.g., Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000) (holding that the cumulative effect of expressing surprise at the peremptory strike and a subsequent series of implausible reasons and bare assertions in justification were indefensible, despite the fact that the ultimate result was a facially satisfactorily race-neutral justification for the strike).

In this case, the Commonwealth articulated clear reasons for striking the juror. We find it notable that when Pollard's counsel brought this challenge to the trial court, the Commonwealth presented the CourtNet report to the judge

---

[6] This Court quoted *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) which stated: "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

and Pollard's counsel.[7]  Counsel and the court then reviewed the document, after which the court made its ruling.  No one discovered the mistake during the bench conference when anyone, the trial court, the Commonwealth or defense counsel, could have easily asked clarifying questions of the juror. While the Commonwealth may have conflated two individuals with similar names, we are unable to say that Pollard has met his burden of proving a racially-motivated reason for the Commonwealth's peremptory challenge.

### C.    *Discovery violations.*

Pollard asserts that the trial court abused its discretion by failing to order a new trial or judgment of acquittal because of a series of discovery violations by the Commonwealth.  The alleged violations concern four items: ballistics testing, police cell phone messages, police fingerprint training manual, and plea bargain terms given to Tapp.  For the reasons discussed below, we reject Pollard's arguments and suggested remedy.

RCr[8] 7.24(1), upon written request, compels the Commonwealth to disclose the substance of any incriminating statements known to or in

---

[7] Pollard's citation to *Foster v. Chapman*, ___ U.S. ___, 136 S.Ct. 1737, 195 L.Ed.2d 1 (2016) does not compel a different result.  In *Foster*, proof was developed that the prosecutor treated white and black prospective jurors differently, notwithstanding substantially similar backgrounds, leading to the conclusion that the reasons for exercising peremptory strikes on black jurors were pretextual.  In this case, Pollard has produced no proof that the Commonwealth failed to strike a white juror who made a misrepresentation on the Juror Qualification Form.  In addition, the prosecutor's file in *Foster* only became available after the defendant filed an open records request.  *Id.* at 1747.  That stands in contrast to the Commonwealth's Attorney in this case disclosing to the trial court and Pollard's counsel the information supporting its basis for the strike, as to which no one followed up with the juror in question who was sitting in the courtroom.

[8] Kentucky Rules of Criminal Procedure.

possession of the Commonwealth, as well as the substance of any expert testimony the Commonwealth intends to introduce at trial. Meanwhile, RCr 7.24(2) entitles the defendant to inspect "data" or other tangible evidence in the "possession, custody, or control" of the Commonwealth "upon a showing that the items sought may be material to the preparation of the defense and that the request is reasonable."

The premise underlying RCr 7.24 is not simply about informing the defendant of the information available to the Commonwealth, but to inform the defendant that the Commonwealth is aware of the information. Given the inherent disparity in resources and access to both incriminating and exculpatory evidence or statements, RCr 7.24 reflects a policy that a criminal defendant not be left in the dark to wonder what the Commonwealth intends to wield against him at trial. *Baumia v. Commonwealth*, 402 S.W.3d 530, 545 (Ky. 2013) (citing *Chestnut v. Commonwealth*, 250 S.W.3d 288, 297 (Ky. 2008)). Stated differently, the purpose of RCr 7.24 is to "ensure[] that the defendant's counsel is capable of putting on an effective defense[.]" *Id.*

As with all discovery rulings, the appeals court must review the trial court's decision for an abuse of discretion. *Brown v. Commonwealth*, 416 S.W.3d 302, 308 (Ky. 2013). Consequently, that decision will remain undisturbed unless it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000). Moreover, this Court has stated explicitly that a conviction is to be set aside because of a discovery violation only when "a 'reasonable probability' [exists] that had the evidence been disclosed the result

11

at trial would have been different." *Weaver v. Commonwealth*, 955 S.W.2d 722, 726 (Ky. 1997) (quoting *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995)); *see* RCr 9.24 (setting forth harmless error rule and stating "court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties[]"); *see also Baumia,* 402 S.W.3d at 545–46 (affirming conviction due to overwhelming evidence against defendant, notwithstanding Commonwealth's failure to disclose prior misdemeanor theft conviction introduced during penalty phase); *Grant v. Commonwealth*, 244 S.W.3d 39, 44 (Ky. 2008) (reversing conviction due to Commonwealth's concealment of defendant's incriminating phone call introduced in rebuttal following defendant's testimony).

1. <u>Ballistics Report</u>. Pollard complains that his counsel received the ballistics report for the .38 caliber bullet retrieved from Fields' body less than forty-eight hours before trial in violation of RCr 7.26. He therefore moved for its exclusion. The Commonwealth's Attorney represented to the trial court that he relayed the information to defense counsel as soon as he received it. Pollard has correctly identified a discovery violation committed by the Commonwealth.

A violation of the forty-eight-hour rule, however, does not require automatic reversal. *Beaty v. Commonwealth,* 125 S.W.3d 196, 202 (Ky. 2003) (internal citation omitted), *abrogated on other grounds by Gray v. Commonwealth,* 480 S.W.3d 253, 267 (Ky. 2016). The trial court in this case acknowledged the discovery violation and admonished the prosecutor but chose to withhold its ruling until after the testimony had been introduced.

12

While perhaps the report should have been excluded, given that Pollard was acquitted of murder and first-degree robbery despite the introduction of the ballistics report, we find any error to be harmless.[9]

2.    Police Cell Phone Messages.    With regards to the Commonwealth's failure to preserve certain text messages on Detective Isonhood's personal cellphone, the trial court conducted an in camera review of the cell phone utilizing a method suggested by Pollard's counsel.  After conducting the review, the court found no messages to which Pollard was entitled and further found no bad faith on the part of the Commonwealth or Det. Isonhood.  Consequently, while conceivable that a discovery violation occurred purely as a result of prosecutorial negligence, no evidence suggests that the violation was prejudicial to Pollard.  Moreover, without any evidence to the contrary, Pollard's assertion is purely speculative.[10]

3.    Fingerprint Training Manual.    Officer Jeremy Ebelhar, crime scene officer with the Henderson Police Department, checked Fields' car for fingerprints.  His testimony was that he obtained two prints but determined they were of insufficient quality for further testing.  Pollard claims that a discovery violation occurred when the Commonwealth failed to produce a training manual, more than a decade old, used by Officer Ebelhar.  The officer testified that he was no longer in possession of the manual.  Pollard argues

---

[9] As suggested by the Commonwealth, the jury likely was uncertain as to who fired the fatal shot.

[10] The Commonwealth, in its Appellee brief, states that this claim is more akin to a destruction of evidence argument.  We agree and note that Pollard does not argue that he was entitled to a missing evidence instruction.

that having the training manual was important to impeach Officer Ebelhar properly. We fail to understand how possession of an old manual would have changed Pollard's strategy in any way. Industry standards for fingerprint and evidence collection are widely known and often litigated. As Pollard's attorney demonstrated, rigorous cross-examination is entirely possible without access to an outdated training material.

4. <u>Tapp's</u> <u>Plea</u> <u>Agreement</u>. Tapp and the Commonwealth entered a plea agreement with respect to the charges against Tapp arising from this incident. Apparently, under the plea agreement, Tapp was to provide a written statement. Tapp, however, never provided the statement. Notwithstanding that Pollard's counsel received the Tapp plea agreement, Pollard claims that Tapp's failure to provide a written statement constituted a modification of the plea agreement to which he was entitled. Since he did not receive a modified plea agreement, Pollard moved for dismissal of the charges. The trial court denied the motion. After reviewing the record, we do not believe the plea agreement was modified or that the trial court abused its discretion when it denied Pollard's motion with regards to Tapp's plea agreement. Regardless, Pollard received a copy of Tapp's plea agreement and was able to cross-examine Tapp about his statements to the police and any inconsistencies in that statement.

### D. *Cumulative error.*

Finally, Pollard argues his conviction should be overturned because of cumulative error. We disagree. To overturn a conviction for cumulative error the defendant must successfully demonstrate that the cumulative effect of a

14

series of errors resulted in prejudice which was not present individually. *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012). Cumulative error is a limited doctrine, which is only appropriate when "individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010)). Here, we have only identified a single instance of a clear violation, the Commonwealth's failure to produce the ballistics report, with which we have already dispensed. Thus, application of the cumulative error doctrine is inappropriate.

## III.   Conclusion.

For the foregoing reasons, the Henderson Circuit Court's judgment is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Mark Daniel Barry
Assistant Attorney General