# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 27, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0393-MR

CHARLES ELMER EAPMON                                       APPELLANT

V.                ON APPEAL FROM KENTON CIRCUIT COURT
               HONORABLE PATRICIA M. SUMME, JUDGE
                     NO. 19-CR-01746-001

COMMONWEALTH OF KENTUCKY                         APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Kenton County jury found Appellant Charles Elmer Eapmon (Eapmon) guilty of two counts of murder and one count of tampering with physical evidence. As recommended by the jury, the circuit court sentenced Eapmon to serve life in prison on each murder count and one year in prison on the tampering with physical evidence count; the sentences run concurrently for a total sentence of life in prison. Eapmon brings five claims of error on appeal. He alleges that: 1) the Commonwealth's questioning techniques were improper, effectively making the prosecutor an unsworn witness; 2) juror misconduct entitled him to a mistrial; 3) the detective improperly interpreted inaudible

portions of Eapmon's interview; 4) KRS[1] 532.055 was exceeded in the sentencing phase because the jury heard about dismissed and amended charges; and 5) the Commonwealth's remarks in closing argument impermissibly called attention to Eapmon's silence. Upon review, we affirm the Kenton Circuit Court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2016, Charles Douglas Eapmon (Dougie) and Carolyn Tomlinson (Carolyn) were shot and killed in their home in the early morning hours while sleeping in their bed. In 2019, Eapmon, Dougie's uncle, and James Allen Eapmon (Jimmy), Eapmon's nephew and Dougie's cousin, were each indicted by a Kenton County grand jury on two counts of complicity to murder and one count of complicity to tampering with physical evidence. Jimmy, in prison for federal drug charges and serving a life sentence, eventually entered a plea deal. Jimmy pled guilty to two counts of facilitation to murder.[2] As part of the deal, he agreed to testify against Eapmon in exchange for the Commonwealth and federal prosecutor submitting a letter to the federal parole board on his behalf. Eapmon went to trial. Jimmy described family dynamics, events leading up to the murder, the preparation and plan to kill Dougie, and the events which occurred after Dougie and Carolyn were killed.

---

[1] Kentucky Revised Statute.

[2] Jimmy entered a guilty plea to two counts of facilitation to murder, to one count of complicity to tampering with physical evidence, and to being a persistent felony offender in the second degree. Jimmy received a total sentence of twenty years, to run concurrently with his federal life sentence.

2

Jimmy testified that he and Dougie were drug dealers, dealing in methamphetamine, cocaine and heroin. While Dougie sold drugs, Dougie did not tolerate anyone in the family using drugs and Dougie controlled family members. According to Jimmy, Dougie would assault family members for drug use or suspected drug use. Jimmy testified that he had witnessed Dougie beat Eapmon in the knees with a bat and Dougie bust open Eapmon's head with the rings on his hand. In the weeks leading up to Dougie's and Carolyn's murder, Dougie had assaulted Eapmon for his drug use. Dougie then required Eapmon to live with Jimmy; Dougie stated he would kill Eapmon, otherwise. Jimmy could not let Eapmon out of his sight or let Eapmon see his girlfriend, or Jimmy himself would be assaulted by Dougie.[3] Eapmon told Jimmy that he was tired of the young punk trying to control his life; that the only thing holding him back from killing Dougie before was Eapmon's mother was still alive; and that with his mother's death, if Dougie put hands on Eapmon again, he would kill Dougie.

On April 5, 2016, Jimmy and Eapmon went to Dougie's house to drop off money for a real estate closing. Eapmon took the money to the door, and when Dougie saw that Eapmon was high, Dougie slapped him. When Eapmon returned to the car, he told Jimmy that he was tired of the young punk controlling his life and he was going to kill Dougie. Jimmy testified that he

---

[3] Jimmy also described Dougie as being controlling in other ways. Dougie told Jimmy he owed him $300,000 due to a drug bust and he had to sell drugs until that debt was paid. Dougie also controlled his grandfather's prescription pain medication usage.

3

went along with Eapmon's plan to kill Dougie because it was inevitable, one was going to kill the other; if he didn't help Eapmon, Eapmon would kill him, too; and a part of him also wanted Dougie dead.

That night and into the next morning, Jimmy and Eapmon went to Dougie's house several times, waiting for the lights to go off. At around 3:45 a.m., Jimmy parked the car near Dougie's house and stayed in the car. Eapmon took his gun and entered the house through a front window. Jimmy testified that about ten to fifteen minutes later, he heard a gunshot. Two minutes later, he heard a second gunshot. Eapmon returned to the car with a safe. Eapmon described shooting Dougie and Carolyn. According to Jimmy, there was no plan to kill Carolyn or to take the safe. Jimmy stated that they drove by Dougie's house and that the screen door and front door were wide open. Eapmon disposed of his clothes in a dumpster and threw the handgun in the river.

Carolyn's 11-year-old daughter went to the basement between 9:00 a.m.-10:00 a.m. the morning of April 6, 2016, and found her mom and Dougie. On her way down to the basement she noticed the front door and screen door were wide open. The daughter tried to wake Carolyn and Dougie and discovered a bloody bed and blood spatter on the wall. She woke Dougie's 12-year-old son to tell him that something had happened; he also could not wake Dougie and Carolyn. According to Carolyn's daughter, they tried to call Jimmy, Eapmon, and Bub (Eapmon's son) before calling 911. They noticed that the safe which had been in the basement laundry room was gone.

Jimmy, Eapmon, and Bub went to the scene. Eapmon went to the police station to give a statement. According to Jimmy, as planned, Eapmon was going to tell the police they had gone by the house one time to drop off money. Jimmy, remaining at the scene, learned a neighbor had a camera facing the road and the camera should have picked up the cars that were on the street the previous night.[4] Jimmy and Bub went to the police station and spoke with Eapmon to inform him about the camera. Eapmon returned to the room and told the police that he forgot that he was at Dougie's house in the early morning hours.

Eapmon's girlfriend at the time of the murders also testified. She testified that on the night of April 6, 2016, Eapmon came to her house. She stated that Eapmon told her that he had killed Dougie and Carolyn, that he had to do it, that Dougie was not ever going to leave him alone, and that he was not ever going to be able to live his own life.

The Commonwealth called a total of 14 witnesses. Eapmon called three witnesses. After a seven-day trial, the jury found Eapmon guilty of two counts of murder and one count of tampering with physical evidence. The jury recommended that Eapmon serve life in prison on each murder count and one year in prison on the tampering with physical evidence count and that the sentences run concurrently for a total sentence of life in prison. The circuit court sentenced Eapmon accordingly.

_____

[4] The neighbor's video footage was processed and no usable video was found.

Eapmon brings five claims of error.[5]  We address each claim in turn.

Additional facts are presented as necessary.

## ANALYSIS

## I.  The Commonwealth's Questioning Did Not Result In Manifest Injustice.

Eapmon's first claim is that the Commonwealth used improper

questioning techniques at trial, effectively allowing the Commonwealth's

Attorney to testify, and thus denying Eapmon due process and a fair trial.

While Eapmon seeks RCr[6] 10.26[7] palpable error review, he clarifies in his reply

brief that defense counsel objected to one of the Commonwealth's statements

which he complains about on appeal and that the statement should be

reviewed by this Court accordingly.  As reflected below, the objection was

sustained.  However, defense counsel did not request an admonition.  We have

previously held that when an admonishment is sufficient to cure an error and

the defendant fails to ask for the admonishment, we will not review the error.[8]

---

[5] Eapmon also seeks relief based upon cumulative error.  Because none of the claims individually raised any real question of prejudice, we conclude there is no basis for relief under the cumulative error doctrine.  *See Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

[6] Kentucky Rule of Criminal Procedure.

[7] RCr 10.26 states:

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

[8] *Lanham v. Commonwealth,* 171 S.W.3d 14, 28 (Ky. 2005).

Nevertheless, upon review, we conclude Eapmon did not suffer manifest justice because of the Commonwealth's statement or other questioning.

After the Commonwealth rested its case, the defense called Jimmy as its first witness. The defense established that when Jimmy was incarcerated on unrelated federal drug charges in 2017, Hubert Lane, Jr. (Lane) was incarcerated at the same detention center. Defense counsel asked Jimmy if he told Lane that he committed the murders or if he told Lane that Bub (Eapmon's son) was there with him. Jimmy denied telling Lane anything about his family or anything about his case. The Commonwealth visited Lane in jail over the weekend, before he was called to testify by the defense. Prior to Lane's testimony, Detective Embry had testified on behalf of the Commonwealth. During that testimony, Detective Embry testified that he had taken two recorded statements from Lane.

The following Monday, Lane was called as a witness by Eapmon. Lane testified that while he and Jimmy were incarcerated together, Jimmy talked with him about his family and after Jimmy commented that Jimmy and "Charlie" had done some "fucked up shit," Lane talked with Detective Embry. The defense asked Lane a series of questions regarding Jimmy's discussion about his family members and Lane's understanding of who Jimmy was referring to when he talked about his family. Lane subsequently testified that Jimmy had actually stated that Jimmy and "Boo" had done some "fucked up shit." Lane later stated that when he said "Boo" he meant "Bub." Defense counsel also asked Lane questions about the Commonwealth Attorney and a

7

detective visiting him in jail over the weekend. Lane said he felt uncomfortable, and although he recognized the detective, the prosecutor did not tell him who they were until the end of the visit.

On cross-examination, after the prosecutor established that he previously prosecuted Lane and was not unknown to Lane,[9] the following colloquy occurred:

CA[10]: At the beginning, did we just tell you to tell us what's going on? Tell us what you're going to say?

HL[11]: Yeah.

CA: Okay, so there was no threats or anything like that in the beginning?

HL: No, but I felt threatened.

CA: Okay. You said two different things here today. You said that [Jimmy] only made one statement to you and that was "me and Charlie did some really fucked up shit"?

HL: Yeah.

CA: Okay, is that correct?

HL: Yes sir.

CA: And then, later on in your conversation with [defense counsel] you changed it to "me and Bub did some really fucked up shit"?

**HL: Well, Charlie was brought up when you said Charlie's name.**

**CA: No, it was not.**

**HL: Yeah, it [(statement unfinished)].**

**DA[12]: Objection.**

**Judge: Sustained.**

---

[9] Eapmon's complaint about this exchange is discussed below.

[10] Commonwealth Attorney.

[11] Hubert Lane, Jr.

[12] Defense attorney.

CA:     Okay, today, you testified earlier today that the first statement [Jimmy] made was "me and Charlie did some really fucked up shit."

HL:     That was the statement that you told me yesterday, the day before yesterday when you seen me, was Charlie. I said Bub. And then come to find out, Bub is Charlie Jr., not Charlie Sr.

CA:     Okay, so you're saying that even though you said Charlie here today, now it's Bub?

HL:     It's Bub. Or rather Boo, not Bub. It's Boo is what I said.

CA:     Okay.


During re-cross examination, the following colloquy occurred:

CA:     Mr. Lane, it's your testimony today that you believe that you told Detective Embry that [Jimmy] said that it was him and Boo that did some really bad shit, and that it was me that told you it was Charlie? Correct?

HL:     Well, you referred to, when I said, day before yesterday, when I referred to Boo, you said Charlie.

          . . .

CA:     But we are clear that you said Charlie to Detective Embry?

HL:     Not meaning Big Charlie, no.

**CA**:     Okay. **Did you tell us the other day the only thing [Jimmy] told you was "Charlie" and you got the rest from everybody else in the pod?**

HL:     Charlie was Boo, he referred to him as Boob, or Bub, or whatever.

CA:     Is that what you said to Detective Embry?

HL:     No, I didn't.

9

Eapmon cites Kentucky Rules of Professional Conduct (SCR)[13] 3.130(3.4)(e),[14] SCR 3.130(3.7),[15] and case law in support of his argument that the Commonwealth's questioning was improper. In particular, Eapmon cites *Holt v. Commonwealth*,[16] reversing the defendant's conviction, and *Fisher v. Commonwealth*,[17] affirming the defendant's conviction, as guidance requiring reversal of his conviction because the Commonwealth acted as a witness during cross-examination. The Commonwealth, on the other hand, argues that the prosecutor was properly impeaching Lane's testimony.

In *Holt*, the Commonwealth called the defendant's jail mate to testify. When the witness did not give testimony consistent with his prior statement to the Commonwealth and denied that the defendant told him that he committed the charged crimes, the prosecutor's questions included: "Do you remember

---

[13] Kentucky Supreme Court Rule.

[14] SCR 3.130(3.4)(e) states:

A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.

[15] SCR 3.130(3.7)(a) states:

A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

[16] 219 S.W.3d 731, 737-38 (Ky. 2007).

[17] 620 S.W.3d 1 (Ky. 2021).

10

talking with me this morning?"; "Do you remember telling me that he told you that he did it?"; "So, you don't recall ever telling me that the defendant in this case told you that he robbed that trailer?"; "Do you remember telling me that the defendant told you that [he put the dolls] in his mom's garage?"; and "But you're now saying that you don't recall telling me that the defendant told you that he put them in his mom's garage?" The Commonwealth rested it case without calling any other witness, so there was no witness who impeached the jail mate's denial of the defendant's alleged statement.[18]

The *Holt* Court concluded that the effect of the prosecutor's questions, asserting what the witness had said to her, placed the prosecutor in the position of making a factual representation.[19] Furthermore, the prosecutor's leading questions put the very words the witness refused to say in his mouth, putting before the jury the credibility of the prosecutor who firmly represented to the jury that the witness had told her that the defendant had committed the robbery.[20] Reviewing our predecessor court's precedent, cases from other jurisdictions, the Commonwealth Attorney's professional responsibilities and duties, and Kentucky Rules of Evidence (KRE) 603[21] and 802,[22] the *Holt* Court

---

[18] *Id.* at 733-34.

[19] *Id.* at 734.

[20] *Id.*

[21] KRE 603 states: "Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."

[22] KRE 802 states: "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky."

explained that it was error for the Commonwealth "to make a statement of fact, the credence of which is always more or less strengthened by [its] official position, outside of the record or evidence, which may tend in the least degree to prejudice the rights of the accused."[23]  The *Holt* Court further explained that the Commonwealth did not properly impeach the witness under KRE 613 and did not observe KRE 611(c), asking leading questions,[24] and "that assertions of fact from counsel as to the content of prior conversations with witnesses have the effect of making a witness of the lawyer and allowing his or her credibility to be substituted for that of the witness."[25]  The *Holt* Court concluded that by the Commonwealth's assertions, statements attributed to the defendant were placed before the jury without any witness saying that the defendant confessed, an error which goes to the heart of fundamental fairness and due process of law.[26]

In *Fisher,* the Commonwealth called the defendant's former cellmate as a witness.[27]  In response to the defense casting doubt on whether the cellmate had learned the details of the crime from the defendant himself or had learned the details by looking at the defendant's discovery while the defendant was away from the cell, the Commonwealth questioned the detective involved to prove that the cellmate learned the details of the crime directly from the

---

[23] 219 S.W.3d at 735 (quoting *Commonwealth v. Cook*, 7 S.W. 155 (Ky. 1888)).

[24] *Id.* at 738-39.

[25] *Id.* at 737.

[26] *Id.* at 734-39.

[27] 620 S.W.3d at 11.

defendant himself.[28]  The Commonwealth questioned the detective about the

Commonwealth's discovery log to show that discovery had not progressed very

far when the witness and the defendant were cellmates.  The Commonwealth

asked the detective about the discovery log and the specific discovery

timeline.[29]  The Commonwealth's questions included: "Were you present in my

office when we typed this up?"; "Do you know when the next batch of

information would have come into the Commonwealth's office?"; "And I

wouldn't have gotten anything else until August 3rd?"; and "Were we able to

note when the preliminary diagnosis from the medical examiner's office was

given to me?"[30]  Upon defense counsel's objection, the trial court directed the

Commonwealth to limit its questioning to matters which the detective had

personal knowledge.[31]

The *Fisher* Court described *Holt* as articulating a particularly sensitive

standard regarding the prosecutor testifying to facts beyond the record through

questioning, especially when the witness's testimony concerns a defendant's

out-of-court admission to a crime.[32]  While recognizing that the Commonwealth

may have properly admitted the discovery log under the rules of evidence, the

*Fisher* Court concluded that by feeding a witness facts beyond the witness's

personal knowledge through leading questions and gestures, like in *Holt*, the

---

[28] *Id.* at 12.

[29] *Id.* at 12-13.

[30] *Id.* at 13.

[31] *Id.*

[32] *Id.* at 14.

prosecutor improperly placed her credibility in issue as an unsworn witness against the defendant.[33]  Nevertheless, distinguishing *Holt* from the facts in *Fisher,* the *Fisher* Court held that the error was not reversible, concluding it was harmless beyond a reasonable doubt.  The Court explained that in *Holt,* the prosecutor "practically supplied a purported confession of a criminal defendant to the jury directly," when faced with a recalcitrant witness who persistently denied ever sharing the confession with the prosecutor, whereas in *Fisher,* the Commonwealth used suggestion to work with a witness unprepared to testify to the unfamiliar details of the discovery timeline, a timeline which was not misrepresented by the Commonwealth, and which did not lend the sort of central necessary support to the Commonwealth's case as the alleged confession did in *Holt.*[34]

In light of these cases, Eapmon claims generally that the effect of the prosecutor's questions asserting what Lane had said to him placed the prosecutor in the position of making a factual representation and through the tenor of the prosecutor's leading questions, the jury was informed that the prosecutor had personal knowledge that Lane was lying on the witness stand, which placed the credibility of the prosecutor before the jury.  Eapmon complains more particularly that the connotation of Lane's testimony on cross-examination was that the prosecutor had visited him and tried to put words in his mouth.  Eapmon argues that Lane's testimony, "Charlie was brought up

---

[33] *Id*. at 14-15.

[34] *Id*. at 15.

14

when [the prosecutor] said Charlie's name," dealt directly with Eapmon's innocence, but that statement was directly negated by the prosecutor as a witness when the prosecutor stated, "No, it was not." Eapmon also argues that the prosecutor continued to testify as a witness when he asked, "Did you tell us the other day the only thing [Jimmy] told you was "Charlie" and you got the rest from everybody else in the pod?"

The Commonwealth argues that the facts in the instant case are inapposite to the fact patterns in *Holt* and *Fisher*. The Commonwealth describes *Holt* as a case in which the prosecutor attempted to impeach the witness with a prior conversation the prosecutor had with the witness, but the prosecutor repeated the substance of the witness's prior statement as if it were a fact, despite the witness's denial of having made the statement. Then in *Fisher*, the Commonwealth asked leading questions to the lead detective on the case about discovery procedures, which allowed the Commonwealth to testify vicariously through the witness.

The Commonwealth contends that, in contrast to *Holt*, Lane was properly impeached under KRE 613, the Commonwealth allowing Lane over and over again to view and hear his prior statement. KRE 613(a) states:

> Examining witness concerning prior statement. Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with opportunity to explain it. The court may allow such evidence to be introduced when it is impossible to comply with this rule because of the absence at the trial or hearing of the witness sought to be contradicted, and when the court finds that the impeaching party has acted in good faith.

15

Upon review, we agree that the Commonwealth's intent with the cross-examination was to impeach Lane with his inconsistent testimony, and the Commonwealth initially did not ask an improper question, and the Commonwealth did not lead Lane to make a statement which implicated that the Commonwealth influenced his testimony. While it may not have been a result of the Commonwealth's improper questioning, we recognize that the Commonwealth's response, denial of any influence upon Lane's testimony, may have initially appeared to call into question Lane's credibility. However, as noted above, defense counsel objected to the Commonwealth's response, "No, it did not," and did not request an admonition. Nevertheless, the Commonwealth later impeached Lane's testimony by refreshing his memory through his recorded statement with Detective Embry. Thus, the jury heard through Lane's testimony during his interview with the detective that he stated "Charlie" as the name of the person Jimmy said he did "some really fucked up shit" with, and not "Boo" or "Bub."

While the Commonwealth did not initially ask an improper question about Lane's out-of-court statements, we agree with Eapmon that one of the Commonwealth's questions to Lane may be viewed in the realm of improper questioning: "Did you tell us the other day the only thing [Jimmy] told you was "Charlie" and you got the rest from everybody else in the pod?" Rather than addressing this question, Lane repeated his testimony that Jimmy referenced "Boo" as the family member with whom he "did some really fucked up shit." Although this question by the Commonwealth is the type *Holt* recognized as

16

improper because "assertions of fact from counsel as to the content of prior conversations with witnesses have the effect of making a witness of the lawyer and allowing his or her credibility to be substituted for that of the witness,"[35] we conclude the Commonwealth's question does not warrant palpable error relief. Lane's testimony was offered by the defense to implicate Jimmy and Bub in the murder, as opposed to Jimmy and Eapmon. Like in *Fisher* and unlike in *Holt*, this question did not "practically suppl[y] a purported confession of a criminal defendant to the jury directly" and was not necessary support to the Commonwealth's case. Here, the jury had substantial, if not overwhelming, testimony regarding Eapmon's guilt to consider, particularly Jimmy's testimony, and Eapmon's girlfriend's testimony who testified that Eapmon confessed committing the murders to her and corroborated Jimmy's testimony about Eapmon's motive for murdering Dougie.

In order to prevail on his claims of error under RCr 10.26, Eapmon must show that the error resulted in "manifest injustice," which we have described

as requiring a showing that there "is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law."[36] Upon review, we conclude that any harm to Eapmon from the Commonwealth questions intended to impeach Lane through his prior inconsistent statement

---

[35] 219 S.W.3d at 737.

[36] *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

17

and to show that Lane's testimony was also based upon conversations with others besides Jimmy, did not rise to the level of manifest injustice.

Eapmon also complains that the Commonwealth violated KRE 609 when the prosecutor further discredited Lane by testifying through his questions that he had prosecuted Lane for bail jumping, for which Lane received a five year sentence. This is also an unpreserved claim of error.

The following exchange between the Commonwealth and Lane occurred at the beginning of the Commonwealth's cross-examination:

CA: You and I have met before?
HL: Yes.
CA: I gave you five years in prison, correct?
HL: Excuse me?
CA: I gave you a bail jumping sentence of five years in prison?
HL: Yes ma'am. Yes sir.

KRE 609 states:

For the purpose of reflecting upon the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record if denied by the witness, but only if the crime was punishable by death or imprisonment for one (1) year or more under the law under which the witness was convicted. **The identity of the crime upon which conviction was based may not be disclosed upon cross-examination unless the witness has denied the existence of the conviction.** However, a witness against whom a conviction is admitted under this provision may choose to disclose the identity of the crime upon which the conviction is based.[37]

The Commonwealth concedes that the prosecutor should not have elicited more than the fact that Lane is a convicted felon. However, the

---

[37] Emphasis added.

Commonwealth argues that this error does not constitute palpable error. We agree. With Lane revealing at the beginning of his testimony that he had been incarcerated since 2016, wearing prison garb on the stand, and having his testimony impeached by his recorded statement to Detective Embry, we conclude that no manifest injustice resulted from the Commonwealth's questioning Lane about the identity of the felony committed.

## II. The Trial Court Did Not Err By Denying a Mistrial.

Eapmon's second claim of error is that the trial court committed reversible error in the penalty phase when it did not grant a mistrial. Eapmon moved for a mistrial alleging juror misconduct.

After the jury returned the guilty verdict and before court was recessed for the evening, the trial court properly admonished the jury.[38] The next morning a witness reported to defense counsel that as three jurors exited the elevator she heard one juror say that her daughter had researched and her daughter said the jury did the right thing.

Once the trial court was informed that there was potential juror misconduct, the trial court immediately took steps to determine if there was any validity to the claim. The trial court held a hearing and questioned the witness who heard the jurors and then questioned each of the three jurors. One juror told the trial court that she spoke with her daughter the night before,

---

[38] *See* KRS 29A.310 and RCr 9.70.

19

she told her daughter the jury had found the defendant guilty, and her daughter said she had researched and said "you did the right thing." The juror and her daughter did not discuss the research. Responding to the trial court's question, the juror stated, "I felt then that we really had done the right thing yesterday." In terms of the conversation's impact on her decision making during the penalty phase, the juror stated that she did not know what the defendant had done in the past and she felt she should be able to make an unbiased decision. The other two jurors denied hearing anything about an affirmation of the verdict and maintained they could be unbiased. Defense counsel moved for a penalty phase mistrial, contending the juror was compromised due to the conversation with her daughter. The trial court found no manifest necessity for a mistrial.

"[A] mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings and there is a 'manifest necessity for such an action.'"[39] "[T]he decision to grant a mistrial is within the trial court's discretion, and such a ruling will not be disturbed absent a showing of an abuse of that discretion."[40]

A defendant has a constitutional right to an unbiased jury,[41] and to a jury whose verdict is based solely on the evidence received in open court.[42]

---

[39] *Woodard v. Commonwealth,* 147 S.W.3d 63, 68 (Ky. 2004) (citation omitted).

[40] *Id.* (citation omitted).

[41] *Conyers v. Commonwealth,* 530 S.W.3d 413, 426 (Ky. 2017) (citing *Remmer v. United States,* 347 U.S. 227 (1954)).

[42] *Id.* (citing *Sheppard v. Maxwell,* 384 U.S. 333 (1966)).

"[J]uror misconduct entitles a defendant to a new trial (or a mistrial) only if there is sufficient evidence to establish both the misconduct and resulting prejudice."[43] The trial court must inquire whether "there is a 'reasonable possibility' that a jury's verdict has been [or will be] affected by material not properly admitted as evidence," and if so "the criminal defendant is entitled to a new trial."[44]

Eapmon recognizes that although improper conversations with a juror are forbidden, not every violation of the rule requires mistrial. Eapmon, nevertheless, views his case to be akin to *Dalby v. Cook*[45], a will contest case, in which the attorney's secretary told a juror: "One got $11,000, the other, $18,000, that's all they deserve."[46] The juror was alleged to say that she agreed and was seen to nod her head in agreement.[47] According to affidavits, the juror said that she could not recall the subject of the conversation with the secretary.[48] However, the secretary made no affidavit, nor did she in any way refute the claimed discussion with the juror.[49] Our predecessor Court considered the irregularity between the juror and one so closely identified with the prevailing litigants as one requiring reversal. The Court stated:

---

[43] *Id.* at 427.

[44] *Id.* at 426-27 (quoting *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994)).

[45] 434 S.W.2d 35 (Ky. 1968).

[46] *Id.* at 37.

[47] *Id.*

[48] *Id.*

[49] *Id.*

What we are holding is that the good name of the jury system requires that jury trials be conducted free from outside influence in fact and that such trials must be so conducted as to leave no question of complete regularity. We think the average citizen would find it difficult to believe that a fair jury trial has occurred when a juror suffers herself to engage in conversation about the case on trial with any person, to say nothing of one as closely identified with the case as was [the secretary].[50]

In *Conyers*, we recognized that in *Dalby* our predecessor Court presumed prejudice when a juror conversed with an interested third-party (the secretary of one side's attorney) and expressed agreement with that person's views as to what the outcome of the case should be.[51] While in this case Eapmon views the conversation between the juror and her daughter as not an innocent or non-substantive conversation, we do not view the conversations in the instant case and in *Dalby* to be comparable, but perhaps more importantly, we do not presume prejudice. "Each case turns on its own facts, and on the degree and pervasiveness of the prejudicial influence possibly resulting."[52] Here, the juror was not presented any information from the daughter about the defendant. While the juror expressed the feeling that after talking with her daughter that "we really had done the right thing yesterday," the juror explained to the trial court that the conversation with her daughter should not impact her, there was no reason she could not make an unbiased decision, and she could put the conversation with her daughter aside when she was making a decision about

---

[50] *Id.* at 38.

[51] 530 S.W.3d at 427.

[52] *Id.* (quoting *Meyer v. State*, 80 P.3d 447, 453 (Nev. 2003)).

22

punishment.  We conclude the trial court did not abuse its discretion by denying the motion for a mistrial.

### III.  The Trial Court Did Not Err By Allowing the Detective To Testify About Eapmon's Taped Interview.

Eapmon's third claim of error is that he was denied due process and a fair trial when the detective interpreted inaudible portions of Eapmon's taped interview.

Detective Embry conducted a video-recorded interview of Eapmon on April 6, 2016.  Detective Embry testified at trial about the interview.  Audio difficulties were experienced by the Commonwealth when playing the video.  Trial recessed that afternoon.  The next day, the prosecutor resumed examining Detective Embry about what Eapmon told him about going to Dougie's house the morning Dougie was killed.  After the first clip was played, the Commonwealth asked the leading question, "Did he say they went to pick up some money?"  When the next clip wasn't very clear, the Commonwealth stated it was going to move the speaker so Detective Embry could hear it.  At that point, defense counsel objected, arguing that the jury could listen to the tape but it could not be interpreted.  The Commonwealth then replayed the clip and asked Detective Embry a series of questions, phrasing the questions in terms of what Detective Embry believed he heard.  After another clip was played, the Commonwealth asked the leading question, "So earlier, he told you he went to pick money up, but now he said they went to drop it off?"  Later, without playing a clip directly beforehand, the Commonwealth asked the

leading question: "Going back to what he actually said in the interview, if you remember, I believe we heard in the clip he said that he wasn't home when Bub allegedly got home at 1:00 a.m.?"

Generally, the testimony of a lay witness is limited to matters or facts about which he has personal knowledge.[53] However, a lay witness is permitted to give opinion testimony, i.e., what he believed, thought, or suspected, about a matter when the witness's opinion is based on knowledge not available to the jury and would be helpful to the jury in reaching its own opinion.[54]

Eapmon complains that the trial court allowed the Commonwealth to ask leading questions and allowed Detective Embry to testify about what he thought Eapmon said on the tapes and this was error, allowing the Commonwealth and Detective Embry to interpret Eapmon's videotaped statement. Eapmon cites *Gordon v. Commonwealth*[55] in support of his argument.

In *Gordon,* Gordon claimed the witness was improperly permitted to interpret the inaudible portions of the tape recording. During Gordon's trial, the Commonwealth replayed a portion of the tape, described by the Court as a substantially inaudible tape recording. After the witness answered that he could hear the tape, the Commonwealth then asked the witness what he said.

---

[53] *See* KRE 602; KRE 701; *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 287 (Ky. 2014); *Martin v. Commonwealth,* 13 S.W.3d 232, 235 (Ky. 1999).

[54] *See* KRE 701; *Gabbard v. Commonwealth,* 297 S.W.3d 844, 855 (Ky. 2009).

[55] 916 S.W.2d 176, 180 (Ky. 1995).

Rather than answering that question, the witness said, "Yes, I went and asked Maurice if he had any stuff. And he told me yes. And I told him I wanted a fifty dollar piece. And he gave it to me. And I said, alright, I sure thank you, Maurice." The Court concluded:

> Upon retrial, the court must determine whether the tape should be admitted and, of course, the witness should be permitted to testify. The court should refrain, however, from permitting the witness to interpret what is on the tape. It is for the jury to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness.[56]

Eapmon contends that, while Detective Embry was entitled to testify as to his recollection of what was said,[57] he went beyond that and provided his version of inaudible portions of the tape, a practice *Sanborn v. Commonwealth*[58] recognized as prohibited. Upon review, we agree with the Commonwealth that Detective Embry was not interpreting the tape like the witness in *Gordon* or providing his version of what was said for unintelligible pieces of conversation. Although the audio was not the best quality, Eapmon's statements which the Commonwealth asked about were discernible. While the Commonwealth's leading questions may have been improper, Detective Embry was asked questions based upon audible portions of the interview, which he was personally familiar with; his statements were responsive to the

---

[56] 916 S.W.2d at 179-80.

[57] *Id.* at 180.

[58] 754 S.W.2d 534, 543 (Ky. 1988).

25

Commonwealth's questions; and he did not progress improperly into the realm of offering opinions.[59] However, even if it were error to allow Detective Embry to testify about Eapmon's video-recorded statements, we conclude it was harmless error and did not affect Eapmon's substantial rights.[60]

## IV. The Commonwealth's Violation of KRS 532.055 Is Not Palpable Error.

Eapmon's fourth claim is that the scope of KRS 532.055 was exceeded in the sentencing phase because evidence was introduced of dismissed charges as well as a charge that had been amended to a lesser offense. Eapmon requests palpable error review.

During the penalty phase, a probation and parole officer testified about Eapmon's prior convictions. The Commonwealth elicited testimony about Eapmon's six prior felony convictions, including a 2006 facilitation to murder conviction. Afterward, the defense elicited testimony that Eapmon pled guilty to all six of these prior felonies.

On re-redirect examination of the probation and parole officer, the prosecutor elicited the following testimony:

CA: [Officer], on all those guilty pleas the [defense counsel] just talked to you about, Mr. Eapmon had a ton of charges dismissed, correct?

PPO[61]: That's correct.

CA: There were PFO's dismissed?

---

[59] *See Cuzick v. Commonwealth*, 276 S.W.3d 260, 266 (Ky. 2009); *McRae v. Commonwealth*, 635 S.W.3d 60, 70–71 (Ky. 2021) (citing *Cuzick*, 276 S.W. 3d at 266).

[60] RCr 9.24.

[61] Probation and Parole Officer.

26

PPO: Yes.

CA: Assault I's dismissed?

PPO: Yes.

CA: I am going to hand you back that indictment in 06-CR-490. . . . And on the indictment, under count 1, what was Mr. Eapmon originally charged with?

PPO: Murder.

CA: But he didn't plead guilty to murder, did he?

PPO: No, he did not.

CA: He pled guilty to a reduced charge of facilitation to murder?

PPO: Correct.

KRS 532.055(2)(a)(2) allows the Commonwealth during the sentencing hearing to offer evidence of "[t]he nature of prior offenses for which [the defendant] was convicted." The Commonwealth may only introduce evidence of the nature of a defendant's prior offenses, including the charges for which he was convicted, and not pre-amended and dismissed charges.[62]

The Commonwealth concedes it was erroneous for the jury to hear Eapmon's dismissed and amended charges but argues that the error is not palpable error. Under the palpable error standard and in this context, a defendant must show a likelihood—"a reasonable possibility"—that, but for the error, a different sentence would have been imposed.[63] The Commonwealth

---

[62] *See Martin v. Commonwealth,* 409 S.W.3d 340, 348 (Ky. 2013); *Blane v. Commonwealth,* 364 S.W.3d 140, 152 (Ky. 2012), *abrogated on other grounds by Roe v. Commonwealth,* 493 S.W.3d 814 (Ky. 2015); *Chavies v. Commonwealth,* 354 S.W.3d 103, 115 (Ky. 2011) (same); *Cook v. Commonwealth,* 129 S.W.3d 351, 365 (Ky. 2004) (citations omitted); *Robinson v. Commonwealth,* 926 S.W.2d 853, 854 (Ky. 1996).

[63] *Parker v. Commonwealth,* 482 S.W.3d 394, 407-08 (Ky. 2016) (citing *Martin,* 409 S.W.3d at 349).

27

asserts that when looking at other cases considering palpable error in this context, the facts of this case are more similar to *Chavies* and *Martin*, two cases in which the Court concluded there was no palpable error, than *Blane*, in which palpable error occurred.

In *Blane,* the jury found Blane guilty of two counts of first-degree trafficking in a controlled substance (cocaine); one count of trafficking in marijuana, eight ounces or more; one count of possession of drug paraphernalia, second or subsequent offense; and of being a first-degree Persistent Felony Offender (PFO).[64] Blane received the recommended thirty year sentence, the maximum sentence.[65] The Commonwealth elicited testimony from the deputy circuit clerk about Blane's original 2001 and 2006 charges, in both cases he was charged with trafficking in a controlled substance and trafficking in marijuana. In both cases, he was convicted of the amended charges: possession of a controlled substance and possession of marijuana.[66]

The Court held the introduction of the defendant's original charges of prior convictions constituted palpable error because it affected a substantial right to due process, resulting in a manifest injustice.[67] Blane received the maximum penalty on all counts for which he was convicted, and the

---

[64] *Id.* at 144.

[65] *Id.* at 152.

[66] *Id.*

[67] 364 S.W.3d at 153.

Commonwealth not only elicited the testimony from the deputy circuit clerk regarding the original charges, but it also emphasized the prior amended charges in its closing argument to the jury.[12] During closing arguments, the prosecutor stated:

> [Appellant], within the past five, six, seven, eight years has been given several chances himself. He had *two* prior charges of trafficking that were amended to possession charges, and he was only given a one-year sentence on each one of those. So please think about the prior chances that he's been given and the fact that he did have the opportunity to take advantage of those chances and to do the right thing. But he kept committing the crimes.[68]

In *Chavies*, the jury found Chavies guilty of being a second-degree persistent felony offender and recommended a sentence of fifty years' imprisonment for manufacturing methamphetamine and ten years' imprisonment for receipt of stolen property, to be served concurrently.[69] During the penalty phase, a prior indictment was introduced.[70] The indictment charged Chavies with first-degree burglary, but he was convicted of second-degree burglary under a guilty plea, and with being a second-degree persistent felony offender, which was later dismissed.[71] The Court concluded that the erroneous introduction of the prior and dismissed charges did not seriously affect the fairness of the proceeding.[72] The dismissed and amended offenses

---

[68] *Id.* at 153 n.12.

[69] 354 S.W.3d at 115.

[70] *Id.* at 114.

[71] *Id.* at 114-15.

[72] *Id.* at 115-16.

were never pointed out to the jury by the trial judge, the Commonwealth, or the Commonwealth's witness; the jury heard about Chavies's other prior convictions, including second-degree burglary, theft of a firearm, criminal mischief, theft of property valued at $300 or more, first-degree robbery, and attempted kidnapping of a minor; and Chavies did not receive the maximum penalty on all of the convictions for which he was being sentenced.[73]

In *Martin*, the jury found Martin guilty of first-degree trafficking in a controlled substance and of being a first-degree persistent felony offender (PFO), and he was sentenced to 20 years in prison, the maximum allowable sentence.[74] During the penalty phase, the circuit court clerk testified to Martin's criminal history by reading his convictions from final judgments; the clerk did not mention originally-charged higher offenses that were amended to lesser offenses resulting in convictions, neither did the trial court nor the prosecutor.[75] However, copies of the final judgments were introduced into evidence as documentary exhibits, and they did contain references to original charges that were ultimately dismissed or amended to lesser offenses.[76]

After considering the circumstances in *Blane* and *Chavies*, *Martin* reasoned that there was only the possibility that the jurors looked at the judgments and learned of Martin's amended original charges and dismissed

---

[73] *Id.* at 115.

[74] 409 S.W.3d at 342, 348.

[75] *Id.* at 348.

[76] *Id.*

charges, but even if the jury had become aware of the original charges underling Martin's prior convictions, it was unlikely that such knowledge affected the resulting sentence. Martin had six prior felony convictions, some of which were for drug-related offenses, including trafficking. The Court concluded that when considering Martin's past convictions in conjunction with his current conviction for drug trafficking, there was not a reasonable possibility that, but for the admission of prior charges which were dismissed or amended, a different sentence would have been imposed for the enhanced first-degree trafficking conviction.[77]

The Commonwealth points out that in this case, although there was testimony that Eapmon's conviction for facilitation to murder was amended down from a murder charge, the amended charge was never referenced again and the dismissed charges were never referenced again, and unlike in *Blane*, the Commonwealth did not emphasize the amended charge or dismissed charges during closing argument. Looking across these cases, in terms of the level of attention drawn to the dismissed and amended charges, it is clear that a great disparity exists between *Martin* and *Chaives*, which may be viewed as closely related, and *Blane*. While the Commonwealth suggests that the facts of this case are more like *Martin* and *Chaives*, because the Commonwealth elicited direct testimony which brought attention to Eapmon's dismissed charges and the amended murder charge, we view this case more akin to *Blane*

---

[77] *Id.* at 349.

in that regard.  However, here, unlike in *Blane*, the Commonwealth did not urge the jury to consider the amended murder charge as Eapmon's unsuccessful opportunity to learn from his mistake because Eapmon was again charged with murder.

Eapmon has a high bar to overcome in order to receive relief based upon this claim of error.  As stated above, he must show a reasonable possibility that, but for the error, a different sentence would have been imposed.  Even though the jury was aware of dismissed PFO and assault charges and the amended murder charge and the Commonwealth pointed out that Eapmon did not plead guilty to murder but to facilitation to murder in the 2006 case, like in *Martin* and *Chavies*, we conclude that under the circumstances of this case and given Eapmon's prior convictions, it is not a reasonable possibility that a different sentence would have been imposed for the two murder convictions if the jury had not heard about prior dismissed charges and the amended charge. Eapmon shot and killed the two victims while they were asleep in their bed. Given these underlying crimes, a prior facilitation to murder conviction, and other felony convictions including receiving stolen property with a value greater than three hundred dollars, possession of a handgun by a convicted felon, assault in the first degree, burglary in the third degree, tampering with physical evidence and being a persistent felony offender, the error did not result in manifest injustice.

## V. The Commonwealth's Remark During Closing Argument Was Not a Comment On Eapmon's Silence.

Eapmon's last argument is that the Commonwealth's remarks in closing argument impermissibly called attention to his silence.

During closing argument, the Commonwealth played a clip from Eapmon's interview with Detective Embry during which Eapmon talked about Carolyn. Afterward, the Commonwealth stated, "Sounds like someone with a grudge. Ladies and gentlemen, she's dead and he's still talking about how much he hates her. So what are we left with? We only have Jimmy's version of what happened." After the trial court denied defense's motion for a mistrial, the Commonwealth continued, "No one contradicted Jimmy's facts he gave you."

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[78] Accordingly, "[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody."[79] However,

> it is clear that not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his constitutional right. The usual situation where

---

[78] U.S. Const. amend. V.

[79] *Hunt v. Commonwealth*, 304 S.W.3d 15, 35–36 (Ky. 2009) (citations omitted).

reversal occurs is where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.[80]

Clearly, at the point of the objection, the Commonwealth did not make a direct comment on Eapmon's invocation of his right to remain silent. In full context, examination discloses that the prosecutor's comments were a comment on the fact that Eapmon did not present any witnesses or evidence contradicting Jimmy's testimony.[81] We do not agree with Eapmon that the Commonwealth's remark was an improper comment on Eapmon's silence. Nevertheless, even if it were, any improper comment was transient and was not emphasized. Considering the evidence properly presented to establish Eapmon's guilt, we cannot conclude that Eapmon was prejudiced by the Commonwealth's remark.[82] Any error was harmless beyond a reasonable doubt.[83]

## CONCLUSION

For the foregoing reasons, the Kenton Circuit Court judgment is affirmed.

All sitting. All concur.

---

[80] *Id.* (quoting *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983)).

[81] *See Murphy v. Commonwealth*, 509 S.W.3d 34, 53 (Ky. 2017).

[82] *See Baumia v. Commonwealth*, 402 S.W.3d 530, 539-40 (Ky. 2013) (citing factors in *United States v. Velarde–Gomez*, 269 F.3d 1023, 1034 (9th Cir. 2001)).

[83] *Chapman v. California,* 386 U.S. 18, 24 (1967).

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General

Thomas Allen Van De Rostyne
Assistant Attorney General