# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: SEPTEMBER 18, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0120-MR

CHAD BURTON          APPELLANT


ON APPEAL FROM GREENUP CIRCUIT COURT
V.      HONORABLE BRIAN CHRISTOPHER MCCLOUD, JUDGE
NO. 20-CR-00128


COMMONWEALTH OF KENTUCKY        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Greenup County jury convicted Chad Burton ("Burton") of one count of first-degree sodomy, two counts of first-degree sexual abuse, one count of use of a minor in a sexual performance, and one count of third-degree unlawful transaction with a minor. Burton was sentenced to twenty-four years of imprisonment. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the judgment of the Greenup Circuit Court.

**<u>BACKGROUND</u>**

On September 10, 2020, a Greenup County Grand Jury indicted Burton on three counts of first-degree sodomy, one count each of use of a minor in a

sexual performance, third-degree unlawful transaction with a minor, and being a convicted felon in possession of a handgun.[1]

This case was first tried in November 2022 but ended in a mistrial. A second trial began on July 17, 2023, and the following facts were learned:

On May 27, 2020, the minor victims, M.T.[2] (13) and M.O. (15) were spending the night with M.O.'s older sister. Earlier that day, M.T., M.O., and their two friends, who were also minors, James[3] (17) and Matthew (13), met at a creek near M.O.'s house to swim and hang out. M.O.'s little sister (age unknown); her cousin, Daniel (10), and another young boy named Charles (8) were there.

While the kids were playing and swimming, Burton, who lived in the neighborhood and was 34 years old at the time, came by. M.T. and M.O. did not know Burton, but James and Matthew introduced them.

Burton spent about twenty minutes with the kids. M.T. testified that while she and Matthew were swimming, Burton told them they should get into bed together and make videos of it. Burton also offered to take pictures of her

---

[1] The circuit court severed the convicted felon in possession of a handgun charge from the other charges, but the disposition of that charge is not included in the appellate record.

[2] We use initials to protect the anonymity of child victims. Counts 1, 2, and 3 of the indictment (the sexual offenses) refer only to M.T. Count 4 of the indictment (unlawful transaction with a minor) lists "two juvenile girls." However, the jury was instructed only as to M.T. on all counts. Throughout the course of discovery and trial, both M.T. and M.O. were referred to as victims.

[3] We use pseudonyms to protect the anonymity of all the other minor children.

2

and Matthew. The comments left M.T. feeling uneasy since Burton was a "grown man."

Later, Burton offered to buy the minors alcohol and let them choose what type of alcohol they wanted. When Burton left to buy alcohol, M.T. and M.O. went to M.O.'s mother's house to shower. The group planned to meet back at a nearby church parking lot to drink together. After showering, the two girls were on their way back to M.O.'s older sister's house when Burton drove by with James, Matthew, Daniel, and Charles in his vehicle and picked the girls up.

Instead of heading to the church, Burton drove to his house. Burton said he needed to get something, but once they were there, everyone started drinking. Burton got out his handgun and let the boys shoot it outside. He also offered bedrooms to James and M.O. and Matthew and M.T. While James and M.O. were in the bedroom talking, Burton stuck his head in to talk to James about M.O. and what they were doing. Burton also walked in on M.T. and Matthew, telling them he was bored and wanted to join in. Then, the children decided it was time to leave.

Matthew texted a relative who came to pick up him, James, and Charles. The others planned to walk home, but as they were leaving, M.T. realized her phone was missing. Burton suggested it might be in his bedroom. When the girls went in to look for the phone, Burton followed them in, shut the door behind him, and shoved M.T. into the door frame.

Burton made M.T. perform oral sex on him and M.O. at gunpoint. Burton also performed oral sex on M.T.'s vagina and anus. After about ten minutes,

3

Daniel banged on the door and ran into the bedroom. Burton jumped up and pushed Daniel out, slammed the door, and said, "We're busy." Burton then pushed M.T. back down and put his mouth on her anus again.

Daniel burst through the door again and yelled, "You guys are getting raped." The girls jumped up and ran with Daniel. M.T. testified that Burton chased them with his gun and threatened to kill them and hurt their family. The three kids ran back to M.O.'s older sister's house and ran into Matthew on the way back. When they arrived at the house, they saw the older sister's neighbor standing in her driveway.

The neighbor testified that the kids were scared as they ran up. The girls went into the older sister's house. The older sister testified that the girls were visibly drunk. Daniel told the older sister what happened, and the girls started crying hysterically. The older sister took the girls to her mother's house. When they got there, Burton was in the driveway with a gun, so the sister drove off in the other direction and called 911.

M.T. went to the hospital for injuries she sustained during the incident. Her ribs were bruised when Burton pushed her into the doorframe. Burton also bruised M.T.'s inner thigh when he held her down on his bed and her arm when he grabbed her.

The jury found Burton guilty of one count of first-degree sodomy, two counts of first-degree sexual abuse, one count of use of a minor in a sexual performance, and one count of third-degree unlawful transaction with a minor.

The circuit court followed the jury's recommendation and sentenced Burton to twenty-four years in prison. This appeal followed.

## ANALYSIS

On appeal, Burton argues: (1) the circuit court erred in failing to grant a mistrial; (2) the circuit court palpably erred in allowing victim impact testimony during the guilt phase of the trial; (3) the circuit court palpably erred in allowing the Commonwealth to present evidence and comment on his invocation of rights; (4) the Commonwealth engaged in prosecutorial misconduct; and (5) cumulative error occurred.

## I. The circuit court did not abuse its discretion in denying Burton's motion for a mistrial.

First, Burton argues the circuit court erred in denying his motion for a mistrial due to the prejudicial conduct of M.T. and a supporter in the courtroom. We review the denial of a motion for a mistrial under the following standard:

> "It is well established that the decision to grant a mistrial is within the trial court's discretion, and such a ruling will not be disturbed absent a showing of an abuse of that discretion." *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Webb v. Commonwealth*, 387 S.W.3d 319, 324 (Ky. 2012) (quoting *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007)) (citing *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)). Additionally, "a mistrial is an extreme remedy and should be resorted to only when there is a *fundamental defect* in the proceedings and there is a '*manifest necessity* for such an action.'" *Woodard*, 147 S.W.3d at 68 (emphasis added). The

5

> cause of the need for a mistrial "must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in *no other way*." *Id.* (emphasis added).

*Commonwealth v. Padgett*, 563 S.W.3d 639, 645 (Ky. 2018).

During the trial, Burton first moved for a mistrial when the Commonwealth called M.T. to the witness stand. M.T. was escorted to the stand by three women. She was upset and audibly sobbing when she entered the courtroom. Defense counsel moved for a mistrial, arguing M.T.'s sobbing was prejudicial, but the circuit court denied the motion.

The circuit court excused M.T., so she could compose herself. M.T. was still sobbing when she exited the courtroom. The court admonished the jury, stating that the emotional display was not evidence and should be disregarded.

About thirty minutes later, during M.T.'s direct examination, defense counsel objected to the foundation the Commonwealth laid for admitting some pictures. Defense counsel said an audience member blurted out a response to the Commonwealth's question about who took the pictures that was probably loud enough for the jury to hear. Though the comment was not audible on the video record, the circuit court appeared to acknowledge it. Defense counsel renewed his motion for a mistrial, but the circuit court denied it because the identity of the photographer was inconsequential.

A few minutes later, the circuit court spontaneously addressed the audience member for her outbursts. A woman in the audience was shaking her head and making comments, and the court told her to stop or she would be removed from the courtroom. Defense counsel approached the bench and

6

asked the court to exclude the woman from the courtroom. The court said it had addressed the problem and then admonished the jury *sua sponte.* The circuit court instructed the jury to disregard the outburst, stating it was not evidence and should not be considered during deliberation.

In *Coulthard,* which established the admonition for the rule on emotional outbursts, there were multiple emotional outbursts by multiple family members. *Coulthard v. Commonwealth,* 230 S.W.3d 572, 576-77 (Ky. 2007). "When there is some kind of emotional display by victims or their family members, this Court has held that an admonition to the jury to disregard the display is more than sufficient to cure any possible prejudice that might occur from the situation." *Id.* at 577; *Saxton v. Commonwealth,* 671 S.W.3d 1, 15 (Ky. 2022). Admonishing the jury is the appropriate remedy because:

> It is a frequent occurrence in homicide cases that the next of kin or other close relatives, under the stress of testifying, or when confronted with personal belongings of the deceased, become emotionally upset, cry, and lose their composure. These are matters that cannot be anticipated and cannot be prevented by denying such persons the right to be present in the courtroom during the trial.

*Coulthard* 230 S.W.3d at 577-78.

Here, defense counsel moved for a mistrial two times during M.T.'s direct examination—once for M.T.'s emotional outbursts and once for outbursts from an audience member. Despite acknowledging on appeal that admonishment is the appropriate remedy for emotional outbursts, Burton never asked the circuit court for an admonition. However, the circuit court admonished the jury each

7

time and instructed M.T. and the audience member to compose themselves following the outbursts. Burton argues the court's admonitions were insufficient.

Burton makes no specific argument regarding how the circuit court's admonitions were insufficient to cure any prejudice that might have resulted from the outbursts. He complains that M.T. had repeated emotional outbursts during her testimony, but he cites no case law in support of this argument because there is none.

Granting a mistrial is only appropriate when prejudice can be removed no other way. It is well-established that an admonition is more than sufficient to cure potential prejudice resulting from an outburst. The circuit court admonished the jury for M.T.'s and the audience member's outbursts, even though Burton never requested one.

Burton also speculates that the audience member's outbursts amounted to gesturing or signaling to M.T. during her testimony. The circuit court addressed the audience member *sua sponte* for shaking her head and making comments aloud. When counsel approached the bench moments later, defense counsel merely asked for the woman to be removed from the courtroom and made no argument about whether the woman signaled or gestured to M.T. Even though defense counsel did not request an admonition, the circuit court admonished the jury again. This argument is unpreserved, and Burton does not request palpable error review for this argument. Burton attempts to "violat[e] our long-standing prohibition against presenting a new theory of error

8

at the appellate level—the overwrought but irresistibly descriptive prohibition against feeding a different can of worms." *Henderson v. Commonwealth*, 438 S.W.3d 335, 343 (Ky. 2014).

Preservation issues aside, the circuit court did not err in declining to grant a mistrial for the audience member's conduct. Burton relies on *Sharp v. Commonwealth*, 849 S.W.2d 542 (Ky. 1993) in support of this argument. In *Sharp*, it was undisputed that a family friend in the audience gestured to a child witness to tell "the child whether to answer yes or no to the questions asked and whether she approved of the child's answers." *Id.* at 546. The family friend also "communicated the substance of some testimony from the courtroom to one or more separated witnesses." *Id.* at 547. The circuit court denied the defendant's motion for a mistrial, but this Court held the circuit court abused its discretion and reversed the judgment. *Id.* at 547-48.

Conversely, in *Graham v. Commonwealth*, 571 S.W.3d 575 (Ky. 2019), this Court held that although the child victim on the stand was a crucial witness in the Commonwealth's case, a mistrial was not warranted. *Id.* at 583-84. Unlike *Sharp,* "there [was] no assertion here that any improper gestures occurred while [the child] was on the witness stand." *Id.* at 583. In *Graham,* the witness "was on his way out of the courtroom during a recess when a bystander made a single gesture—a thumbs up." *Id.* This Court noted, "[t]he facts of *Sharp* were extreme." *Id.*

"Such an interaction, if in sight of the jury, is unacceptable, as it may boost the credibility of the witness in the eyes of the jury. However, in the

9

present case, the jury was not polled even to determine if they had viewed the gesture." *Id.* at 584. In *Graham*, the appellant rejected an offered admonition. *Id.*

Here, there was no request for a jury poll. This argument was not raised, and Burton did not request or reject an admonition. Defense counsel did not renew its motion for a mistrial after the circuit court addressed the woman for shaking her head and making comments aloud. Instead, counsel asked for the woman to be excluded from the courtroom. Despite failing to request an admonition, the circuit court, in its sound discretion, admonished the jury to cure any prejudice. A mistrial was unwarranted because the circuit court gave an admonition to cure any prejudice. Thus, the circuit court did not abuse its discretion in failing to grant a mistrial due to alleged improper gesturing.

## II. The circuit court did not palpably err in allowing victim impact testimony on direct examination because the victim's credibility was at issue.

Second, Burton argues the circuit court palpably erred in allowing M.T. and M.O. to give victim impact testimony during the guilt phase of the trial. Burton concedes this error is unpreserved and requests palpable error review under RCr[4] 10.26.

> To establish palpable error, Appellant must show "the probability of a different result or error so fundamental as to threaten his entitlement to due process of law." *Brooks v. Commonwealth*, 217 S.W.3d 219, 225 (Ky. 2007) (citation omitted). On appellate review, our focus is on whether "the defect is so manifest, fundamental

---

[4] Kentucky Rules of Criminal Procedure.

10

> and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

*Huddleston v. Commonwealth*, 542 S.W.3d 237, 245 (Ky. 2018).

Burton's defense was that M.O. and M.T. were lying. Defense counsel put their credibility at issue in his opening statement when he told the jury the victims and witnesses, who were all minors that had been out late drinking, made up a cover story to avoid getting in trouble.

During M.O.'s direct examination, the Commonwealth asked her about how Burton's abuse affected her. M.O. testified that she was on a high dosage of anxiety and depression medications, had PTSD[5], and went to therapy. She testified that she was homeschooled for two years, missed two years of high school, and was homebound because she could not handle being around a lot of people. M.O. said she had panic attacks, had had issues keeping a job, and had not had a boyfriend or many friends.

M.T. also testified about how the assault affected her. She said she could not go to school, see her friends, go out in public places, or talk to her dad. M.T. testified that she could not go to school because she shuts down around men she does not know. She said she could not go anywhere because she was afraid grown men would look at her.

Burton argues that permitting this testimony was reversible error under *Alderson v. Commonwealth*, 670 S.W.3d 884 (Ky. 2023). In *Alderson,* the

---

[5] Post Traumatic Stress Disorder.

Commonwealth elicited similar testimony from the minor victims when it asked how the sexual assaults affected them. *Id.* at 891. Alderson objected and argued it sounded like the Commonwealth "was soliciting victim impact evidence that was not appropriate at [that] stage of the proceedings." *Id.* The Commonwealth argued the testimony went to the victim's credibility because defense counsel questioned the victim's credibility during his opening statement. *Id.* The victims' testimony in *Alderson* was similar to M.O.'s and M.T.'s. *Id.*

This Court applied three intersecting rules: "(1) victim-impact evidence is typically inadmissible until the penalty phase of the trial; (2) victim background evidence is generally admissible; and (3) a witness can generally bolster her own testimony after her credibility has been attacked." *Id.* at 893. This Court held the victim's testimony "by its very nature it constitutes victim impact testimony because it established the terrible consequences of the defendant's actions on her life going forward and was likely to arouse the jurors' sympathy." *Id.* at 893-94.

Then, this Court considered "whether this question was nevertheless appropriate to bolster [the victim's] credibility because, as the Commonwealth argued, Alderson attacked her credibility during his opening statement on the basis that this case was a 'she said, he said' type of case." *Id.* at 894. There, the appellant preserved the issue, and this Court held, "[v]ictim impact testimony is *not* appropriate for bolstering credibility. Instead, another method of bolstering credibility could have been used." *Id.*

12

Because Burton failed to preserve this argument, we turn to *Tackett v. Commonwealth*, 445 S.W.3d 20 (Ky. 2014) for our analysis. In *Tackett*, the defendant argued the victims "gave victim impact testimony during the guilt phase of the trial." *Id.* at 33. Tackett argued the following amounted to impermissible victim impact testimony: that the female victim had "an extremely sensitive gag reflex, making medical examinations, brushing her teeth, and sometimes even eating, difficult; that the examination at Hope's Place was unpleasant and embarrassing; and that she had been seeing a psychiatrist during the preceding year." *Id.* Tackett also contested the male victim's "testimony that the examination at Hope's Place was unpleasant." *Id.*

There, this Court determined that the female victim's "testimony was relevant to show that she was not fabricating the allegations." *Id.* This Court also determined the male victim's "testimony about the nature of the Hope's Place examination contained elements of both victim impact and credibility evidence and was admissible for that later purpose." *Id.* at 34. This Court held that Tackett failed to show how "the result would have been different" without this evidence, so there was no palpable error. *Id.* The *Alderson* opinion noted that under the circumstances in *Tackett,* "it would have been very difficult for any defendant to establish manifest injustice or a different result at trial in the absence of this evidence." *Alderson,* 670 S.W.3d at 894.

M.O. and M.T.'s testimony was relevant to demonstrate their credibility, even though it also contained elements of victim impact testimony. Though Burton argues this evidence was highly prejudicial, he fails to establish "that

13

admitting the evidence caused a manifest injustice or that, absent this evidence, the result would probably have been different." *Tackett*, 445 S.W.3d. at 33. Thus, we discern no palpable error.

### III. The circuit court did not palpably err in allowing the Commonwealth to present evidence and comment on his invocation of rights.

Third, Burton argues the circuit court erred in allowing the Commonwealth to present evidence about the invocation of his right to an attorney[6] and commenting on the same during its closing argument. Burton concedes this argument is unpreserved and requests palpable error review.

During the Commonwealth's case-in-chief, Trooper Jones testified about his investigation. Trooper Jones had some difficulty locating Burton. About three weeks after the alleged incident occurred, Trooper Jones found Burton in the parking lot of his workplace while Burton was on a break. The trooper introduced himself and asked Burton if he would talk to him. Burton responded that he did not mind and asked Trooper Jones for a ride to the Greenup County courthouse. The trooper gave him a ride to the courthouse.

At the courthouse, Trooper Jones told Burton the interview was noncustodial, and Burton did not have to speak to him, could leave at any time or get a ride back to work, and was not under arrest. The trooper also talked to Burton about telling the truth and told Burton it would be better to end the interview than lie. About fifteen minutes into the interview, Trooper Jones and

---

[6] During Trooper Charles Jones' testimony, the Commonwealth played Burton's entire interview, which contained Burton's invocation of his right to counsel.

14

Burton discussed the events of the day, including their visit to the creek and the children's visit to his house. When Trooper Jones asked for more information about when the kids came to his house, Burton said, "I probably better get a lawyer." The trooper asked whether Burton wanted to speak to him anymore, and Burton said no. Trooper Jones immediately terminated the interview.

"The Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody." *Ordway v. Commonwealth*, 391 S.W.3d 762, 777 (Ky. 2013). However, the fact of a "pre-arrest, *pre-Miranda* warning invocation of rights by a suspect" is only "inadmissible in the Commonwealth's case-in-chief *if* official compulsion was present in extracting the invocation." *Spears v. Commonwealth*, 448 S.W.3d 781, 786 (Ky. 2014) (citing *Baumia v. Commonwealth*, 402 S.W.3d 530, 538 (Ky. 2013)).

Burton's silence was briefly mentioned again during Trooper Jones's cross-examination. Defense counsel asked Trooper Jones about the interview. The trooper responded that he tried to get Burton's side of the story, but Burton did not want to speak to him.

Additionally, the Commonwealth commented on Burton's silence during its closing argument. The Commonwealth reviewed the evidence and argued that Burton continually lied to the police because he did not want to get caught. The Commonwealth then argued that Burton stopped the interview because he could not talk his way out of it.

15

"While the *fact* of Appellant's refusal is fully admissible at trial . . . the Commonwealth sought, and the trial court allowed the introduction of Appellant's *entire* statement." *Baumia*, 402 S.W.3d at 539. In *Baumia*, this Court determined "[t]he phrasing and language employed by Appellant in refusing the breathalyzer test was not indicative of guilt and was both irrelevant and unduly prejudicial[,]" so the circuit court abused its discretion in allowing the Commonwealth to introduce the entire statement. *Id.*

There was no official compulsion present when Burton invoked his right to counsel. Burton asked Trooper Jones for a ride to the courthouse. At the beginning of the interview, Burton agreed that the interview was voluntary and noncustodial. Trooper Jones informed Burton he was free to terminate the interview and leave at any time. Burton continued with the interview until Trooper Jones asked Burton what occurred when the kids visited his house. The fact of Burton's invocation was admissible, but allowing the phrasing and language of the invocation would likely have been an abuse of discretion had this issue been preserved.

Because Burton's argument is unpreserved, we examine whether the circuit court palpably erred in allowing the Commonwealth to play the video recording of Burton's full statement during Trooper Jones' testimony and commenting on the same during its closing argument. Burton is required to show the "probability of a different result or error so fundamental as to threaten [his] entitlement to due process of law." *Martin*, 207 S.W.3d at 3. In *Baumia*, the Commonwealth played the appellant's entire statement invoking

16

his right to counsel, but no other comments were made during "closing argument, or elsewhere." *Baumia*, 402 S.W.3d at 540. The evidence in *Baumia* was also extensive and included the appellant's blood alcohol level, accident reconstruction, and autopsy results. *Id.* at 540-41.

Here, the Commonwealth made one brief comment regarding Burton's silence during the closing argument, and defense counsel elicited one statement from Trooper Jones about Burton's silence during cross-examination. Though Burton's silence was mentioned three times, the Commonwealth did not belabor the point to infer guilt. Each instance was brief in the context of the three-day trial. Additionally, the testimony against Burton was strong. M.O. and M.T. gave detailed testimony about Burton sexually abusing them at gunpoint. Daniel testified to his observations about what he saw when he entered the room where Burton held the girls. The older sister and neighbor testified about the state the children were in when they arrived at the sister's house.

Burton's argument failed to demonstrate how the result would have been different without it or that his trial was manifestly unjust. Thus, there was no palpable error.

17

**IV.    There was no prosecutorial misconduct.**

Burton argues the Commonwealth eliciting victim impact testimony from M.T. and M.O during the guilt phase was prosecutorial misconduct. He concedes this argument is unpreserved and requests palpable error review. "Because this issue is unpreserved, we will reverse only if the conduct was both flagrant and constitutes palpable error resulting in manifest injustice." *Barrett v. Commonwealth*, 677 S.W.3d 326, 333 (Ky. 2023) (citing RCr 10.26; *Matheney v. Commonwealth*, 191 S.W.3d 599, 606, 607 n.4 (Ky. 2006)). This Court weighs the following four factors in determining whether the Commonwealth's conduct was flagrant:

> (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. [*Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020)] (footnotes omitted). We look at the claimed error in context to determine whether, as a whole, the trial was rendered fundamentally unfair. *Id.* (footnote omitted).

*Barrett*, 677 S.W.3d at 334.

Burton argues the Commonwealth engaged in prosecutorial misconduct in: (1) eliciting victim impact testimony from M.O. and M.T., and (2) introducing testimony about Burton's silence and commenting on it during the closing argument. The Commonwealth argues this is a repackaging of Burton's arguments about victim impact testimony and invocation of his rights. We agree that Burton's claim "is, at best, an attempt to repackage an evidentiary claim as prosecutorial misconduct." *St. Clair v. Commonwealth*, 451 S.W.3d

18

597, 641 (Ky. 2014). "[U]npreserved claims of error cannot be resuscitated by labeling them cumulatively as 'prosecutorial misconduct.'" *Noakes v. Commonwealth*, 354 S.W.3d 116, 122 (Ky. 2011).

First, the Commonwealth did not attempt to mislead the jury about the facts of the case. The victim impact testimony was more probative than prejudicial because it was relevant to prove the victims did not fabricate the allegations against Burton. Playing the entire video where Burton invoked his rights to silence and counsel may have been somewhat prejudicial and perhaps an abuse of discretion had Burton objected and the trial court overruled his objection, but he did not object. Thus, the error was not preserved. We hold it was not palpable.

Second, the remarks about the victim's quality of life after the incident and Burton's silence were isolated in the context of the entire trial. In its closing argument, the Commonwealth argued that the victim impact testimony bolstered M.T. and M.O.'s credibility. The Commonwealth argued they gave the same account three times and discussed the girls' trauma in conjunction with their credibility.

Third, the Commonwealth admits that the remarks about Burton's silence and the testimony obtained from the victims were deliberate. Finally, the other evidence against Burton was compelling. M.O. and M.T.'s testimonies were consistent and detailed. Daniel also provided eyewitness testimony about what he observed, and M.O.'s older sister's neighbor testified about seeing the girls immediately after the incident. Although two of the factors favor Burton,

19

overall, the trial was not fundamentally unfair. This is supported by the fact that Burton recharacterized evidentiary issues as prosecutorial misconduct. Therefore, the Commonwealth's comments during the closing argument did not constitute flagrant misconduct.

## V.    There was no cumulative error.

Finally, Burton argues his conviction should be reversed because of cumulative error. Cumulative error is the "doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). This Court has "found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* None of the issues Burton raised rendered his trial fundamentally unfair. Thus, there was no cumulative error that affected the fairness of Burton's trial.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the Greenup Circuit Court.

Lambert, C.J.; Bisig, Goodwine, Keller, Nickell, and Thompson, JJ., sitting. All concur. Conley, J., not sitting.

20

COUNSEL FOR APPELLANT:

Sarah D. Dailey
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General